**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| 3BTECH, INC., | |
| *Plaintiff,* | |
| v. | **Court No.  21-cv-00026** |
| UNITED STATES, | |
| *Defendant.* | |

<u>**PROPOSED ORDER**</u>

Upon consideration of Plaintiff's Motion for Summary Judgment, and all of the pleadings and papers on file herein, and after due deliberation, it is hereby —

**ORDERED** that Plaintiff's motion for summary judgment is granted; and it is further

**ORDERED** that the subject merchandise is properly classified in subheading 9503.00.0090, HTSUS, duty- and tariff-free; and it is further

**ORDERED** that Defendant reliquidate the entries covered by this action with a refund of all duties and/or tariffs overpaid, plus interest, as provided by law.

_____
HON. JANE A. RESTANI, JUDGE

Dated: New York, New York

This _____day of _____, 2024.

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**

|  |  |
|---|---|
| 3BTECH, INC., | |
| *Plaintiff,* | |
| v. | **Court No.  21-cv-00026** |
| UNITED STATES, | |
| *Defendant.* | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In accordance with Rule 56 of the Rules of the United States Court of International Trade ("USCIT"), Plaintiff, 3BTech, Inc. ("3BTech"), hereby moves this Court for summary judgment. This Motion is supported by the separate statement of undisputed material facts and exhibits, as well as the Plaintiff's memorandum in support of this motion.

For the reasons set out therein, Plaintiff submits that the merchandise which is the subject of this action is properly classified under subheading 9503.00.0090 of the Harmonized Tariff Schedule of the United States ("HTSUS"). The subject merchandise is thus free of any duty and China Section 301 tariffs.

Alternatively, if this Court determines that the merchandise which is the subject of this action is properly classified under subheading 8711.60.00, HTSUS, the subject merchandise is free of any duty and China Section 301 tariffs because it is covered by one of the following exclusions provided for in U.S. Note 20(v) to Subchapter III of Chapter 99, HTSUS:

- (86) Motorcycles with electric power for propulsion, each of a power not exceeding 1,000 W (described in statistical reporting numbers 8711.60.0050 or 8711.60.0090). *See* 84 Fed. Reg. 49,600, 49,609; and/or

- (87) Skateboards with electric power for propulsion, of a power not exceeding 250 W (described in statistical reporting number 8711.60.0050). *See* 84 Fed. Reg. 49,600, 49,609.

WHEREFORE, Plaintiff respectfully requests that judgment be granted in its favor; and that the defendant United States and U.S. Customs and Border Protection be directed to reliquidate the entries subject to this action, classifying the subject merchandise under subheading 9503.00.0090, HTSUS, and to refund to Plaintiff the excess duties and/or tariffs collected, together with interest, as provided by law.

Respectfully submitted,

Dated:    July 12, 2024

_____
Serhiy Kiyasov, Attorney

Lawrence R. Pilon
Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Plaintiff 3BTech, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ............................................................................... iii

TABLE OF EXHIBITS TO COUNSEL DECLARATION ........................................ vii

INTRODUCTION .............................................................................................. 1

TARIFF PROVISIONS AT ISSUE ....................................................................... 5

QUESTION PRESENTED FOR DECISION ........................................................... 6

SUMMARY OF THE ARGUMENT ...................................................................... 7

JURISDICTION ................................................................................................ 9

STANDARD OF REVIEW .................................................................................. 9

ARGUMENT .................................................................................................. 12

I.    Hoverboards Are Principally Used as Toys for Amusement, Diversion,
      and Play, Rather Than Practicality ....................................................... 15

      A.    General Physical Characteristics of Hoverboards Show that
            They Are Toys .......................................................................... 15

      B.    The Ultimate Purchaser Expects to Use Hoverboards as Toys,
            Not as Means of Transportation ................................................. 16

      C.    Hoverboards Move in The Same Channels, Class, and Kind of Trade
            as Toys of Heading 9503, HTSUS ............................................. 17

      D.    The Environment of Hoverboards' Sale is Consistent with Toys of
            Heading 9503, HTSUS .............................................................. 18

      E.    Hoverboards Are Used in The Same Manner as Toys of Heading
            9503, HSTUS .......................................................................... 18

      F.    Hoverboards are Only Economically Practical if Used as Toys .......... 19

      G.    The Industry Recognizes That Hoverboards Are Used as Toys .......... 19

II.   Hoverboards Are Appropriately Described Specifically as "Wheeled Toys"
      as Provided for in Heading 9503, HTSUS ............................................. 20

      A.    Hoverboards Do Not Require Training Prior to Use ........................ 22

i

B.   The Use of Hoverboards Does Not Involve Any Meaningful
     Risk of Injury in Excess of Other Motorized Wheeled Toys ................................. 24

C.   The Users Need Not Develop a Degree of Skill to Fully Utilize
     Hoverboards .......................................................................................................... 25

D.   There is No Exercise or Athletic Aspect in the Use of Hoverboards ................. 27

E.   Hoverboards Are Equipped with Assistive Devices ............................................ 28

III.   Hoverboards are Further Classified Under Subheading 9503.00.0090 ........................... 29

IV.   Hoverboards Cannot be Classified as "Transportation Devices" of
      Heading 8711, HTSUS .................................................................................................... 30

V.   If the Court Determines That Hoverboards are Properly Classified Under
     Subheading 8711.60.00, HTSUS, Hoverboards Are Also Classified Under
     Heading 9903.88.17, HTSUS duty- and tariff-free ........................................................ 33

CONCLUSION ................................................................................................................................ 36

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*ABB, Inc. v. United States*,
421 F.3d 1274 (Fed. Cir. 2005)...........................................................................13

*Algoma Steel Corp., Ltd. v. United States*,
865 F.2d 240 (Fed. Cir. 1989)..............................................................................22

*Bausch & Lomb, Inc. v. United States*,
148 F.3d 1363 (Fed. Cir. 1998)......................................................................10, 11

*CamelBak Prods., LLC v. United States*,
649 F.3d 1361 (Fed. Cir. 2011)...........................................................................13

*Chevron Chem. Co. v. United States*,
59 F. Supp. 2d 1361 (Ct. Int'l Trade 1999) .........................................................11

*Deckers Outdoor Corp. v. United States*,
714 F.3d 1363 (Fed. Cir. 2013)...........................................................................10

*Hewlett-Packard Co. v. United States*,
189 F.3d 1346 (Fed. Cir. 1999)...........................................................................10

*Link Snacks, Inc. v. United States*,
742 F.3d 962 (Fed. Cir. 2014).............................................................................10

*Loper Bright Enters. v. Raimondo*,
Nos. 22-451, 22-1219, 2024 U.S. LEXIS 2882 (June 28, 2024) ........................11

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)...........................................................................................11

*Minnetonka Brands v. United States*,
24 Ct. Int'l Trade 645 (2000)..........................................................................14, 15

*N. Am. Processing Co. v. United States*,
236 F.3d 695 (Fed. Cir. 2001).............................................................................13

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998)...........................................................................13

*Plexus Corp. v. United States*,
489 F. Supp. 3d 1379 (Ct. Int'l Trade 2020) .......................................................10

*R.T. Foods, Inc. v. United States,*
887 F. Supp. 2d 1351 (Ct. Int'l Trade 2012) ............................................................10, 11

*Schlumberger Tech. Corp. v. United States,*
845 F.3d 1158 (Fed. Cir. 2017)...........................................................................10

*SGS Sports Inc. v. United States,*
620 F. Supp. 3d 1365 (Ct. Int'l Trade 2023) ...................................................10

*Streetsurfing LLC v. United States,*
38 Ct. Int'l Trade 1327, 11 F. Supp. 3d 1287 (Ct. Int'l Trade 2014) ....................... *passim*

*Toy Biz, Inc. v. United States,*
248 F. Supp. 2d 1234 (Ct. Int'l Trade 2003) ...................................................13

*United States v. Carborundum Co.,*
536 F.2d 373 (1976)..........................................................................................15

*United States v. Pan Pac. Textile Group Inc.,*
276 F. Supp. 2d 1316 (Ct. Int'l Trade 2003) ...................................................11

*Universal Elecs. Inc. v. United States,*
112 F.3d 488 (Fed. Cir. 1997).........................................................................11

*Warner-Lambert Co. v. United States,*
407 F.3d 1207 (Fed. Cir. 2005)........................................................................11

## **Statutes**

15 U.S.C. § 2052 .................................................................................................29, 30

19 U.S.C. § 1515.......................................................................................................9

19 U.S.C. § 1515(b)...................................................................................................9

19 U.S.C. § 2411(a)(1)...............................................................................................3

28 U.S.C. § 1581(a) ...................................................................................................9

28 U.S.C. § 2640(a) .................................................................................................10

28 U.S.C. § 2673(a) ...................................................................................................9

Harmonized Tariff Schedule of the United States

    Additional Rule of Interpretation 1(a) ...................................................14

iv

Chapter Note 4 to Chapter 87 ........................................................................13, 31

Explanatory Note to Heading 8711...............................................................31, 33

Explanatory Note to Heading 9503....................................................12, 21, 22, 28

General Rule of Interpretation 1 ...............................................................................13

Heading 8711 ................................................................................................. passim

Heading 8712 ...................................................................................................13

Heading 9503 ................................................................................................. passim

Heading 9506 ...............................................................................................13, 30

Heading 9508 ...............................................................................................13, 30

Heading 9903.88.17 ......................................................................................... passim

Section Note 1 to Section XVII .....................................................................13, 30

Subheading 8711.60.00...................................................................................... passim

Subheading 8711.60.0050....................................................................3, 6, 34, 35

Subheading 8711.60.0090.......................................................................3, 6, 34

Subheading 9503.00.00.......................................................................................5, 13

Subheading 9503.00.0090................................................................................... passim

Subheading 9503.00.0090......................................................................................29

Subheading 9903.88.02.......................................................................................5, 6

U.S. Note 20(v) to Subchapter III of Chapter 99 .......................................... passim

U.S. Note 20(v)(86) to Subchapter III of Chapter 99 ................................... passim

U.S. Note 20(v)(87) to Subchapter III of Chapter 99 ................................... passim

## Other Authorities

USCIT Rule 56 .................................................................................................................1

USCIT Rule 56(a) ...........................................................................................................10

*Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
84 Fed. Reg. 49,600 (Sep. 20, 2019) ..................................................................................3

*Initiation of Section 301 Investigation; Hearing; and Request for Public Comments: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
82 Fed. Reg. 40,213 (Aug. 24, 2017)...................................................................................3

*Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 14,906 (Apr. 6, 2018) .....................................................................................3

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
83 Fed. Reg. 47,974 (Sept. 21, 2018) ..................................................................................3

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
84 Fed. Reg. 20,459 (May 9, 2019) .....................................................................................3

*Procedures for Requests To Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
84 Fed. Reg. 29,576 (June 24, 2019) ...................................................................................4

*Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*,
84 Fed. Reg. 49,600 (September 20, 2019) ............................................................. 4, 6, 7

## TABLE OF EXHIBITS TO COUNSEL DECLARATION

| Exhibit | Description |
|---|---|
| A | Plaintiff's Initial Disclosures |
| B | Swagtron Website Printouts |
| C | Plaintiff's Responses to Defendant's First Interrogatories |
| D | Swagtron Packaging Layouts |
| E | Inventor's Article |
| F | Kid's Coloring Page |
| G | Protest 3901-20-106024 |
| H | Additional Hoverboards Customer Reviews on Amazon and Swagtron Websites |
| I | Inventor's Second Article |
| J | Deposition of Mr. Johnny Zhu |
| J-1 | T1 User Manual |
| K | Deposition of Mr. Dwayne Rawlings |
| L | Deposition of Mr. Bert Reiner |
| L-1 | CPSC Age Guidelines |
| L-2 | Reiner Pictures |

| | |
|---|---|
| **M** | Deposition of Mr. Edward Benjamin |
| **N** | Expert Witness Rebuttal Report of Steve Velte to Government Expert Report of Bert L. Reiner |
| **O** | Expert Witness Rebuttal Report of Steve Velte to Government Expert Report of Edward Benjamin |
| **P** | Deposition of Mr. Stephen Velte |
| **Q** | Toy Car Manual 1 |
| **R** | Toy Car Manual 2 |
| **S** | Phoenix, AZ Toy Vehicle Prohibition |
| **T** | Worth, IL Toy Vehicle Prohibition |
| **U** | Hoverboard at the International Toy Fair in New York |

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**

3BTECH, INC.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant.*

Court No.  **21-cv-00026**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

In accordance with Rule 56 of the Rules of the United States Court of International Trade

("USCIT"), Plaintiff, 3BTech, Inc. ("3BTech" or "Plaintiff"), hereby respectfully moves this

Court for summary judgment and submits the following memorandum of law in support thereof.

**INTRODUCTION**

This test case involves the classification of Swagtron® hoverboards or self-balancing

electric scooters (collectively referred to as "Hoverboards" or "Subject Merchandise"). The

classification of Hoverboards is an issue of first impression for this Court.

All Hoverboards have two wheels driven by 200–300-watt electric motors powered by

rechargeable batteries. **Plaintiff's Statement of Undisputed Material Facts ("PSUF") 15.**

Hoverboards are small in size, propelled by motors of a power not exceeding 250 watts (except

in the case of the 300-watt motors used in the T6 model), and could not be relied upon for

extended riding times. **PSUF 28**. Located between the wheels of the Hoverboards are foot treads

that the rider stands on. **PSUF 16**. The foot treads of the Hoverboards can be controlled

independently, and the rider controls the direction and speed of the Hoverboard with foot

pressure on the front or back of each of the foot treads leaning forward and back. **PSUF 17**. The

Hoverboards are self-balancing, because they include gyroscopes and related electronics that

sense the position and momentum of the Hoverboard and adjust the speed and direction of the wheels. **PSUF 18**. Hoverboards are designed, marketed, and used as wheeled toys, packaged with kids' coloring pages, and they are designed with and/or contain various entertaining features. **PSUF 19-21, 30, 31**. Hoverboards are not and cannot be used for transportation and are not a practical means for providing transportation. **PSUF 29-30, 42**.

 3BTech imported Hoverboards, which originated in China, into the United States in September 2018 through June 2019. **PSUF 3-5**. The Hoverboards were entered under subheading 9503.00.0090, Harmonized Tariff Schedule of the United States ("HTSUS"), duty- and tariff-free. **PSUF 6-7**. On various dates in August 2019, United States Customs and Border Protection ("CBP") liquidated all entries of the Subject Merchandise with duty rate increase of 25% *ad valorem* as a result of reclassification of the Subject Merchandise under several statistical tariff provisions under subheading 8711.60.00, subject to China Section 301 tariffs. **PSUF 8-9**. The protests that are the subject of this action were each timely filed within one hundred and eighty (180) days of the final liquidation of each of the underlying protested entries and subsequently denied. **PSUF 10-11**. This action was timely commenced within one hundred and eighty (180) days after the date of mailing of the notices of denial of the underlying protests that are the subject of this action. **PSUF 12**.

 3BTech contends that, because the Subject Merchandise is properly classified as "wheeled toys" under subheading 9503.00.0090, HTSUS, which is duty- and tariff-free, the Subject Merchandise must be excluded from the additional 25% China Section 301 tariff.

 Alternatively, if this Court determines that the Subject Merchandise is properly classified under subheading 8711.60.00, HTSUS, the Subject Merchandise is free of any duty and China

Section 301 tariff because it is covered by one of the following exclusions provided for in U.S.

Note 20(v) to Subchapter III of Chapter 99, HTSUS:

- (86) Motorcycles with electric power for propulsion, each of a power not exceeding 1,000 W (described in statistical reporting numbers 8711.60.0050 or 8711.60.0090). *See* 84 Fed. Reg. 49,600, 49,609; and

- (87) Skateboards with electric power for propulsion, of a power not exceeding 250 W (described in statistical reporting number 8711.60.0050). *See* 84 Fed. Reg. 49,600, 49,609.

In 2017-2019, pursuant to Section 301 of the Trade Act of 1974 (*as amended*, 19 U.S.C.

§ 2411(a)(1)), the Office of the United States Trade Representative ("USTR") took various

actions which culminated in the imposition of an additional 25 percent *ad valorem* duty on

various products imported from China. *See Initiation of Section 301 Investigation; Hearing; and*

*Request for Public Comments: China's Acts, Policies, and Practices Related to Technology*

*Transfer, Intellectual Property, and Innovation*, 82 Fed. Reg. 40,213, 40,213 (Aug. 24, 2017);

*Notice of Determination and Request for Public Comment Concerning Proposed Determination*

*of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology*

*Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 14,906, 14,907 (Apr. 6, 2018);

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to*

*Technology Transfer, Intellectual Property, and Innovation*, 83 Fed. Reg. 47,974, 47,974 (Sept.

21, 2018) (giving notice of List 3 action and imposition of 10 percent duties on List 3 articles);

*Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to*

*Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 20,459, 20,459 (May

9, 2019) (announcing that duties on List 3 articles would be increased to 25 percent beginning

the following day). This 25 percent *ad valorem* duty applied to articles classified under subheading 8711.60.00, HTSUS, originating in China.

Following the imposition of the additional 25 percent *ad valorem* duty, the USTR established a process by which importers could request that specific products classified within an affected tariff provision be excluded from (that is, imported without application of) such duties. *See Procedures for Requests To Exclude Particular Products From the September 2018 Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 29,576 (June 24, 2019).

As part of this exclusion process, for the period of August 23, 2018, through September 20, 2020, the USTR granted the exclusions provided for in U.S. Notes 20(v)(86) and 20(v)(87) to Subchapter III of Chapter 99, HTSUS, referenced above. These exclusions were provided for under Heading 9903.88.17, HTSUS, and described in U.S. Note 20(v)(86, 87) to Subchapter III of Chapter 99, HTSUS. *See Notice of Product Exclusions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*, 84 Fed. Reg. 49,600 (September 20, 2019) (hereinafter "*Exclusion Notice*").

The *Exclusion Notice* specifically provides as follows:

> In accordance with the September 18 notice, ***the exclusions are available for any product that meets the description in the Annex***, regardless of whether the importer filed an exclusion request. Further, the scope of each exclusion is governed by the ***scope of the product descriptions in the Annex***…

84 Fed. Reg. at 49,601 (emphasis added).

Thus, if this Court determines that the Subject Merchandise is properly classified under subheading 8711.60.00, HTSUS, 3BTech contends that the Subject Merchandise should be duty- and tariff-free (excluded from any China Section 301 tariff) by application of one of the Note 20 exclusions listed above.

4

## <u>TARIFF PROVISIONS AT ISSUE</u>

CBP liquidated the Subject Merchandise under various statistical tariff provisions under

primary subheading 8711.60.00, HTSUS (2019 Rev. 11 for all references), which provides as

follows:

| 8711 | Motorcycles (including mopeds) and cycles fitted with an auxiliary motor, with or without side-cars; side-cars: |
|---|---|
| **8711.60.00** | With electric motor for propulsion. |

This subheading had an applicable *ad valorem* duty rate of Free.

Additionally, CBP liquidated the Subject Merchandise under secondary subheading

**9903.88.02**, HTSUS, which provides as follows:

Except as provided in headings 9903.88.12, 9903.88.17, 9903.88.20, 9903.88.54, 9903.88.59, 9903.88.61, 9903.88.63, 9903.88.66, 9903.88.67, 9903.88.68, or 9903.88.69, articles the product of China, as provided for in U.S. note 20(c) to this subchapter and as provided for in the subheadings enumerated in U.S. note 20(d).

This subheading had an additional applicable 25% China Section 301 tariff.

3BTech contends that the classification of the Subject Merchandise in subheadings

8711.60.00 and 9903.88.02, HTSUS, is incorrect, and the Subject Merchandise must be

classified under subheading **9503.00.0090**, HTSUS. Which provides as follows:

| 9503.00.00 | Tricycles, scooters, pedal cars and ***similar wheeled toys***; dolls' carriages; dolls, other toys; reduced-scale ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof |
|---|---|
| **9503.00.0090** | ***Other***. |

Alternatively, if this Court determines that the Subject Merchandise is properly classified

under subheading 8711.60.00, HTSUS, 3BTech contends that the Subject Merchandise should be

also classified under heading 9903.88.17, HTSUS, which provides as follows:

Articles the product of China, as provided for in U.S. note 20(v) to this subchapter, ***each covered by an exclusion granted by the U.S. Trade Representative***.

This subheading was not subject to the additional 25% Section 301 duty at any time relevant to this action.

U.S. Note 20(v) to Chapter 99, HTSUS, states that, "[p]ursuant to the product exclusion process, the U.S. Trade Representative has determined that the additional duties provided for in heading 9903.88.02 shall not apply to the following particular products, which are provided for in the enumerated statistical reporting numbers":

- (86) Motorcycles with electric power for propulsion, each of a power not exceeding 1,000 W (described in statistical reporting numbers 8711.60.0050 or 8711.60.0090). *See Exclusion Notice*, at 49,609; and

- (87) Skateboards with electric power for propulsion, of a power not exceeding 250 W (described in statistical reporting number 8711.60.0050). *See Exclusion Notice*, at 49,609.

As explained herein, if the Subject Merchandise is properly classified under subheading 8711.60.00, HTSUS, it must be excluded from the additional 25% Section 301 duty pursuant to Heading 9903.88.17 and to **U.S. Notes 20(v)(86) and/or 20(v)(87)** to Subchapter III of Chapter 99, HTSUS.

## QUESTION PRESENTED FOR DECISION

This matter presents one, and possibly two questions before the Court for decision.

**First**, whether the Subject Merchandise is classified under:

(1) subheading 9503.00.0090, HTSUS, duty- and tariff-free; or

(2) subheading 8711.60.00, HTSUS, duty- and tariff-free.

**Second**, *if* the Court decides that the Subject Merchandise is classified under Subheading 8711.60.00, HTSUS, whether the Subject Merchandise is also secondarily classified under

Heading 9903.88.17, HTSUS, duty- and tariff-free, by application of one of the following tariff exclusions provided for in U.S. Note 20(v) to Chapter 99, HTSUS:

    a.   (86) Motorcycles with electric power for propulsion, each of a power not exceeding 1,000 W (described in statistical reporting numbers 8711.60.0050 or 8711.60.0090). *See Exclusion Notice*, at 49,609; and/or

    b.   (87) Skateboards with electric power for propulsion, of a power not exceeding 250 W (described in statistical reporting number 8711.60.0050). *See Exclusion Notice*, at 49,609.

## SUMMARY OF THE ARGUMENT

The identity of the Subject Merchandise is not in dispute. All Hoverboards have two wheels, are small in size, propelled by motors powered by rechargeable batteries of a power not exceeding 250 watts (except in the case of the 300-watt motors used in the T6 model), balanced by gyroscopes, and could not be relied upon for extended riding times. **PSUF 15, 18, 28**. Located between the wheels of the Hoverboards are foot treads that the rider stands on. **PSUF 16**. The foot treads of the Hoverboards can be controlled independently, and the rider controls the direction and speed of the Hoverboard with foot pressure on the front or back of each of the foot treads leaning forward and back. **PSUF 17**. The Hoverboards are self-balancing because they include gyroscopes and related electronics that sense the position and momentum of the Hoverboard and adjust the speed and direction of the wheels. **PSUF 18**. Hoverboards are designed, marketed, and used as wheeled toys, packaged with kids coloring page, and contain various entertaining features. **PSUF 19-21, 30, 31**. Hoverboards cannot be used for transportation and are not practical for transportation. **PSUF 29-30, 42**. As such, Hoverboards are principally used as toys for diversion, amusement, and play, rather than practicality.

Further, Hoverboards are undisputably wheeled toys of Heading 9503, HTSUS, due to the following factors. Hoverboards have no training requirement prior to use. **PSUF 34, 35, 44, 46, 47**. There is no meaningful risk of injury involved in the use of Hoverboards in excess of other motorized wheeled toys of Heading 9503, HSTUS, such as children's cars powered by a motor. **PSUF 45, 57**. There is no acquired skill needed to fully utilize Hoverboards. **PSUF 34, 35, 44, 46, 47**. There is no exercise or athletic aspect when using Hoverboards. **PSUF 48**. Hoverboards are equipped with assistive devices such as electric motors and gyroscopes. **PSUF 49, 60, 77**.

It follows that the Subject Merchandise is properly classified as wheeled toys under subheading 9503.00.0090, HTSUS, duty- and tariff-free.

Alternatively, if this Court determines that the Subject Merchandise is properly classified under subheading 8711.60.00, HTSUS, the Subject Merchandise is free of any duty and China Section 301 tariffs, because it is covered by one of the following exclusions provided for in U.S. Note 20(v) to Subchapter III of Chapter 99, HTSUS:

- (86) Motorcycles with electric power for propulsion, each of a power not exceeding 1,000 W (described in statistical reporting numbers 8711.60.0050 or 8711.60.0090). *See Exclusion Notice*, at 49,609; and

- (87) Skateboards with electric power for propulsion, of a power not exceeding 250 W (described in statistical reporting number 8711.60.0050). *See Exclusion Notice*, at 49,609.

First, Hoverboards are motorized cycles propelled by motors powered by rechargeable batteries of a power not exceeding 250 watts (except in the case of the 300-watt motors used in

the T6 model). Thus, they may qualify for an exclusion provided for under Heading 9903.88.17,

Note 20(v)(86) to Subchapter III of Chapter 99, HTSUS.

Second, Hoverboards can be considered skateboards because they are short boards

mounted with wheels at each end on which a person rides in a standing or crouching position.

Hoverboards are propelled by motors powered by rechargeable batteries of a power not

exceeding 250 watts (except in the case of the 300-watt motors used in the T6 model). Thus, they

may qualify for an exclusion provided for under Heading 9903.88.17, Note 20(v)(87) to

Subchapter III of Chapter 99, HTSUS.

<u>**JURISDICTION**</u>

3BTech brings this action pursuant to 19 U.S.C. § 1515. The Court has exclusive

jurisdiction over any civil action commenced to contest the denial of a protest, in whole or in

part, under section 515 of the Tariff Act of 1930 pursuant to 28 U.S.C. § 1581(a). 28 U.S.C. §

1581(a) (2022). Protests number 3901-20-106997, 3901-20-107048, and 3901-20-106024, which

are at issue in this action, were timely filed and subsequently denied pursuant to 19 U.S.C. §

1515(b). **PSUF 10-11**. 3BTech timely filed the summons in this action on January 26, 2021, after

having paid the liquidated duties in accordance with 28 U.S.C. § 2673(a). 28 U.S.C. § 2673(a)

(2022); **PSUF 12-13**. Thus, the Court has jurisdiction over this action.

<u>**STANDARD OF REVIEW**</u>

When reviewing the denial of a protest and a classification challenge, the Court "does not

defer to [CBP's] decisions" and instead applies the *de novo* standard of review to "the record

made before the court." *R.T. Foods, Inc. v. United States*, 887 F. Supp. 2d 1351, 1354–55 (Ct.

Int'l Trade 2012), *aff'd*, 757 F.3d 1349 (Fed. Cir. 2014) (citations omitted); 28 U.S.C. § 2640(a)

9

(2022); *see also Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1389 (Ct. Int'l Trade 2020).

A two-step analysis guides the Court in ascertaining the appropriate classification of merchandise: (1) determining the proper meaning of the terms in the tariff provision; and (2) confirming whether the subject merchandise falls within the parameters of the tariff provision. *SGS Sports Inc. v. United States*, 620 F. Supp. 3d 1365, 1371 (Ct. Int'l Trade 2023); *Hewlett-Packard Co. v. United States*, 189 F.3d 1346, 1348 (Fed. Cir. 1999). While the first prong serves as a question of law, the second is a question of fact. *SGS Sports Inc.*, 620 F. Supp. 3d at 1371.

In cases where "there is no dispute as to the nature of the merchandise, then the two-step classification analysis collapses entirely into a question of law," and the Court may resolve a classification dispute as a matter of law on a motion for summary judgment. *Link Snacks, Inc. v. United States*, 742 F.3d 962, 965–66 (Fed. Cir. 2014) (citations omitted); *see also Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1163 (Fed. Cir. 2017). Thus, summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. USCIT R. 56(a); *see also Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1371 (Fed. Cir. 2013); *Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998); *Plexus Corp.*, 489 F. Supp. 3d at 1388.

"Courts must exercise their independent judgment" when interpreting the law. *See Loper Bright Enters. v. Raimondo*, Nos. 22-451, 22-1219, 2024 U.S. LEXIS 2882, *62 (June 28, 2024). "[S]tatutory presumption of correctness … does not apply to pure issues of law in a summary judgment motion before the Court," as the Court has an obligation to independently "decide the legal issue of the proper meaning and scope of HTSUS terms." *R.T. Foods, Inc.*, 887 F. Supp. 2d at 1354 (*citing Universal Elecs. Inc. v. United States*, 112 F.3d 488, 491-92 (Fed. Cir. 1997)

("[p]ure questions of law, such as the proper interpretation of a particular tariff provision or term…lie within the domain of the courts…and the presumption [of correctness] carries no force as to questions of law.")); *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citation omitted).

Summary judgment in a classification action is particularly appropriate where, as here, "there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb, Inc.*, 148 F.3d at 1365. In determining whether a genuine issue of fact exists, the Court reviews the evidence submitted and draws all inferences in favor of the party opposing the motion. *United States v. Pan Pac. Textile Group Inc.*, 276 F. Supp. 2d 1316, 1318–19 (Ct. Int'l Trade 2003); *see also Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But even if there are "differences in the factual positions advanced by each party," summary judgment remains appropriate unless there are "genuine issues of material fact in dispute." *Chevron Chem. Co. v. United States*, 59 F. Supp. 2d 1361, 1363 (Ct. Int'l Trade 1999).

Here, no dispute exists as to the nature of the Subject Merchandise. The Subject Merchandise comprises several Hoverboard models (T1, T5, T6, T380, T500, T580, T588, and T881) that are small in size, propelled by motor of a power not exceeding 250 watts (except in the case of the 300-watt motors used in the Swagtron T6), and could not be relied upon for extended riding times. **PSUF 14-28**. Hoverboards' principal use is amusement, diversion, and play, rather than practicality. **PSUF 19-48**. Hoverboards cannot be used for and are not practical for transportation. **PSUF 29, 30, 42**. Hoverboards have no training requirement prior to use. **PSUF 34, 35, 44, 46, 47**. There is no meaningful risk of injury involved in the use of Hoverboards in excess of other motorized wheeled toys of Heading 9503, HSTUS, such as

children's cars powered by a motor. **PSUF 45, 57**. There is no acquired skill needed to fully utilize Hoverboards. **PSUF 34, 35, 44, 46, 47**. There is no exercise or athletic aspect when using Hoverboards. **PSUF 48**. Hoverboards are equipped with assistive devices such as electric motors and gyroscopes. **PSUF 49, 60, 77**.

Thus, the primary issue for the Court is to determine whether Hoverboards are classified under subheading 9503.00.0090, HTSUS, based on the undisputed material facts. As detailed in this memorandum and related supporting materials, Hoverboards are properly classified as wheeled toys under subheading 9503.00.0090, HTSUS, by virtue of meeting the standard outlined in *Streetsurfing LLC v. United States*, 38 Ct. Int'l Trade 1327, 11 F. Supp. 3d 1287 (Ct. Int'l Trade 2014) ("*Streetsurfing*"), and sharing certain characteristics with children's cars powered by a motor that are specifically listed as wheeled toys in the Harmonized Commodity Description and Coding System Explanatory Notes ("Explanatory Notes") to Heading 9503, HTSUS. Accordingly, 3BTech is entitled to summary judgment as a matter of law.

## ARGUMENT

Unless specifically indicated otherwise, the General Rules of Interpretation ("GRIs") and the Additional Rules of Interpretation ("ARIs") provide the analytical framework for the interpretation of the tariff provisions within each chapter, heading, and subheading to classify imported merchandise. *See N. Am. Processing Co. v. United States*, 236 F.3d 695, 698 (Fed. Cir. 2001); *Toy Biz, Inc. v. United States*, 248 F. Supp. 2d 1234, 1242 (Ct. Int'l Trade 2003) (*citing Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998)). The GRIs and ARIs are applied in numerical order, and if an "earlier rule resolves a classification question, the court does not look to subsequent rules." *ABB, Inc. v. United States*, 421 F.3d 1274, 1276 (Fed. Cir. 2005); *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011). GRI 1

12

specifically provides that the classification of goods must be determined according to the terms of the headings of the tariff schedule and any relative Section or Chapter notes. GRI 1.

For the instant dispute, Plaintiff contends that the Subject Merchandise is properly classified as a wheeled toy under HTSUS subheading 9503.00.00, and not as a motorcycle/cycle fitted with an electric motor under subheading 8711.60.00. This position is amply supported by the relevant Section and Chapter Notes of the competing provisions. Section Note 1 to HTSUS Section XVII—which includes articles of Chapter 87—states that "[t]his section ***does not cover articles of heading 9503*** or 9508, or sleds, bobsleds, toboggans or the like of heading 9506" (emphasis added). The Section Notes thus provide that, if the Subject Merchandise is properly classified under Heading 9503, it is *excluded* from classification as a motorcycle. Additionally, Chapter Note 4 to HTSUS Chapter 87 provides that children's bicycles are to be classified in Heading 8712, and instructs that all "***[o]ther children's cycles fall in heading 9503***" (emphasis added). Accordingly, if the Court should characterize the Subject Merchandise as a children's cycle—which includes children's cycles that are fitted with an electric motor—the applicable Subject and Chapter Notes instruct that they are to be classified as a toy under HTSUS Heading 9503, and that they are excluded from classification under Chapter 87.

"The Court may also refer to the Explanatory Notes accompanying a tariff subheading." *Streetsurfing LLC*, 38 Ct. Int'l Trade at 1331 (internal citation and quotation omitted). "Although the Explanatory Notes do not constitute controlling legislative history, they are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting the HTSUS." *Id.*, (internal citation and quotation omitted). "Therefore, although not legally binding or dispositive, the Explanatory Notes may be consulted for guidance and are generally indicative of the proper

interpretation of the various HTSUS provisions." *Id*. at 1331-32 (internal citation and quotation omitted).

The Court has long established that Heading 9503 is a "principal use" provision, insofar as it pertains to "toys." *See, e.g.*, *Minnetonka Brands v. United States*, 24 Ct. Int'l Trade 645, 651 (2000). "Because [H]eading 9503 is, in relevant part, a principal use provision, classification under this provision is controlled by the principal use of goods of that class or kind to which the imported goods belong in the United States at or immediately prior to the date of importation." *Id.*, ARI 1(a). "Principal use is defined as the use which exceeds any other single use of the article." *Id*.

The classification of "wheeled toys" under Heading 9503, HTSUS, is governed by the Court's decision in the *Streetsurfing* case. In *Streetsurfing*, the Court determined that classification as a ***toy*** under HTSUS Heading 9503 requires that the article be principally used a toy, that is, being an "article[] whose principal use is amusement, diversion, or play, rather than practicality." *Streetsurfing*, 38 Ct. Int'l Trade at 1333-1334 (internal citation and quotation omitted; emphasis added). Further, the Court held that "in addition to being an item with wheels that is used principally for amusement, a ***wheeled toy*** under Heading 9503 is also characterized by the following features: (1) the absence of a training requirement prior to its use; (2) the absence of a meaningful risk of injury involved in its use; (3) the lack of acquired skill to fully utilize the item; (4) the lack of exercise or athletic aspect in the item's use; and (5) the presence of an assistive device." *Id.* at 1335 (emphasis added). No single factor listed above is determinative in this analysis.

I.      **Hoverboards Are Principally Used as Toys for Amusement, Diversion, and Play, Rather Than Practicality**

"To determine whether the subject imports are of the class or kind of merchandise whose principal use is amusement, diversion or play … the [C]ourt examines all pertinent circumstances." *Minnetonka Brands*, 24 Ct. Int'l Trade at 651 (citing *United States v. Carborundum Co.*, 536 F.2d 373, 377 (1976)). The factors which have been considered in making this determination, which have come to be described as the "*Carborundum factors*," include: (1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels, class or kind of trade in which the merchandise moves; (4) the environment of the sale (*i.e.*, accompanying accessories and the manner in which the merchandise is advertised and displayed); (5) usage, if any, in the same manner as merchandise which defines the class; (6) the economic practicality of so using the import; and (7) the recognition in the trade of the use. *Minnetonka Brands*, 24 Ct. Int'l Trade at 651-652 (applying *Carborundum factors*).

In this case, there is no dispute that *Carborundum factors* listed above clearly support a finding that Hoverboards are principally used as toys for amusement, diversion, and play, rather than practicality.

A.      **General Physical Characteristics of Hoverboards Show that They Are Toys**

Numerous physical characteristics indicate that Hoverboards are principally used for amusement, diversion, and play, rather than practicality. Hoverboards are packaged with kids coloring pages. **PSUF 20**. Hoverboards encompass entertaining features such as color casing, built-in speaker for music, LED lights with different colors, Bluetooth connection to a phone application, and the different ways to maneuver (*i.e.*, rapidly change the direction rather than

15

prolonged travel) while riding the product. **PSUF 21**. Hoverboards include colorful designs to make the product more attractive to kids. **Exhibit A**. Marketing photographs, website printouts, and catalogs portray children as the typical riders of Hoverboards. **PSUF 22**. Hoverboards are kids' choice wheeled toys as shown on the cover of Hoverboards' user manuals. **PSUF 32**. Hoverboards are not practical for and cannot be used for transportation because they do not have long lasting batteries and are not adapted with features that would allow prolonged travel. **PSUF 29-30, 42-43, 83-84.** Finally, Hoverboards are not equipped with emergency brakes, shocks, headlights, taillights, and horns, which are in general essential for transportation devices. **PSUF 21**. Thus, physical characteristics clearly show that Hoverboards are used for amusement, diversion, and play, rather than practicality.

### B. The Ultimate Purchaser Expects to Use Hoverboards as Toys, Not as Means of Transportation

Record evidence clearly indicates that ultimate purchasers and end users of Hoverboards use them for amusement, diversion, and play, rather than practicality. Hundreds of customer reviews throughout various online retail platforms indicate that Hoverboards are being purchased as presents for kids to play with rather than practical transportation devices. **PSUF 24**, and various customer reviews in **Exhibits A** and **H**. Further, Hoverboards were designed for people, especially youth, to have fun while riding. **PSUF 25**. Hoverboards were designed and are being used for recreational purposes because they aim to provide entertainment and amusement for children of suitable age and weight. **PSUF 26**. The function of Hoverboards is to entertain and amuse child riders during their leisure times. **PSUF 27**. Marketing photographs, website printouts, and catalogs portray children as the typical riders of Hoverboards. **PSUF 22**. Finally, Hoverboards' inventor, Mr. Shane Chen, confirmed that Hoverboard is just a toy, "[a] toy for

kids, for adults … [i]t's fun … [b]ut you cannot use it for transportation… [i]t's not practical." **PSUF 29-30**.

Hoverboards have little to no function as a transport device. They are not designed to travel substantial distances or at significant speeds. *See* **Exhibit A**, product catalog. The motors that serve as the primary propulsion mechanism are powered by batteries with a limited capacity. *See* **Exhibit A**, product catalog. The Hoverboards are incapable of lasting a significant distance on a single charge, and there are no reasonable means by which the batteries can be recharged outside of the home. *See* **Exhibit A**, Product Catalog; **PSUF 36**. In short, Hoverboards lack the kind of functionality that would cause a user to perceive them primarily as a means of transport rather than amusement and play.

Accordingly, kids, who are primarily the ultimate users of the Subject Merchandise, clearly expect to use Hoverboards for diversion, amusement, and play, rather than practicality.

### C.    Hoverboards Move in The Same Channels, Class, and Kind of Trade as Toys of Heading 9503, HTSUS.

Record evidence clearly shows that Hoverboards move in the same channels, class, and kind of trade as toys of Heading 9503, HTSUS. Defendant's representative, Mr. Dwayne Rawlings, admitted that Hoverboards are sold at online marketplaces—such as QVC, Walmart, Target, and Amazon—under the same toy category where many goods of Heading 9503, HTSUS, are sold. **PSUF 41**. Online sellers recognize Hoverboards as toys by listing the merchandise predominantly under "Toys" category. **PSUF 23, 71-72**. Further, Defendant's own expert presented pictures and confirmed that Hoverboards are ***not*** sold next to electric bicycles, helmets, or related accessories in retail stores, but rather are sold alongside other wheeled toys, such as kid's ride-on scooters that are intended for children 2 years and older. **PSUF 71-72**.

Thus, Hoverboards are sold in the same channels, class, and kind of trade as toys of Heading 9503, HTSUS.

>    **D.    The Environment of Hoverboards' Sale is Consistent with Toys of Heading 9503, HTSUS**

The environment of sale for the Hoverboards, including their accompanying accessories and the manner in which they are advertised and displayed, shows that Hoverboards are akin to toys withing Heading 9503, HTSUS. Hoverboards are packaged with kids' coloring pages. **PSUF 20**. Hoverboards include and advertise features that are solely intended for amusement and entertainment, such as color casings, built-in speakers for playing music, decorative LED lights with different colors, and Bluetooth connection to phone applications. **PSUF 21**. Marketing photographs, website printouts, and catalogs portray children as the typical riders of Hoverboards. **PSUF 22**. Finally, Hoverboards are advertised and displayed in retail establishments as toys along other toys of Heading 9503, HTSUS. **PSUF 19-27, 41, 71-72**. Defendant's own expert, Mr. Edward Benjamin, confirmed that Hoverboards are marketed to kids as toys and entertainment and are being sold and purchased for kids as riding toys. **PSUF 78-81**. Accordingly, the environment of Hoverboards' sale is consistent with toys of Heading 9503, HTSUS.

>    **E.    Hoverboards Are Used in The Same Manner as Toys of Heading 9503, HSTUS**

Hoverboards are clearly used in the same manner as toys of Heading 9503, HTSUS, for amusement, diversion, and play, rather than practicality. Hoverboards are used for recreational purposes because they aim to provide entertainment and amusement for children of suitable age and weight. **PSUF 26**. The function of Hoverboards is to entertain and amuse child riders during their leisure times. **PSUF 27**. Hoverboards cannot be relied upon for extended riding times. **PSUF 28**. Finally, Hoverboards' inventor, Mr. Shane Chen, confirmed that Hoverboard is just a

toy, "[a] toy for kids, for adults … [i]t's fun … [b]ut you cannot use it for transportation… [i]t's not practical." **PSUF 29-30**. Defendant's representative, Mr. Dwayne Rawlings, likewise acknowledged that Hoverboards are not practical for transportation. **PSUF 42**. Thus, it is clear that Hoverboards are used for diversion, amusement, and play, and are not practical or meant to be used in the same manner as transportation devices that are classified under Heading 8711, HTSUS.

### F.    Hoverboards are Only Economically Practical if Used as Toys

Record evidence clearly indicates that it is not economically practical to use hoverboards as transportation devices because they do not have long lasting batteries and are not adapted with features that would allow prolonged travel. **PSUF 29-30, 36, 42-43, 83-84.** Thus, it is only economically practical to use Hoverboards as toys for amusement, diversion, and play, rather than practicality.

### G.    The Industry Recognizes That Hoverboards Are Used as Toys

Defendant's representative, Mr. Dwayne Rawlings, confirmed that goods of Heading 9503, HTSUS, are sold under the same toy category under which Hoverboards are sold at QVC, Walmart, Target, and Amazon. **PSUF 41**. Specifically, Hoverboards are predominantly sold under "toy" category in various retail establishments (both physical and online). **PSUF 23, 71-72**. Further, Defendant's own expert presented pictures and confirmed that Hoverboards are not sold next to electric bikes and helmets in retail stores, but rather are sold next to wheeled toys, such as kid's ride-on scooters that are intended for children of 2 years and older. **PSUF 71-72**. Finally, Hoverboards were introduced and showcased at the International Toy Fair in New York. **PSUF 90**; **Exhibit U**. Thus, both major retailers and Defendant's own representative and expert, along with prominent retailers and distributors in the industry, recognize that Hoverboards are used as toys of Heading 9503, HTSUS.

Taken as a whole, all of these factors combined clearly demonstrate that Hoverboards are used for amusement, diversion, and play: all hallmarks of articles that are classified under the HTSUS as toys of Heading 9503. In contrast, Hoverboards are not principally used for a practical means of travel and transport. Given this, an analysis of the *Carborundum factors* should lead the Court to the conclusion that Hoverboards are of the same class or kind of goods as toys classified in Heading 9503, HTSUS.

**II.      Hoverboards Are Appropriately Described Specifically as "Wheeled Toys" as Provided for in Heading 9503, HTSUS.**

The undisputed facts in this case further support a finding that Hoverboards are "wheeled toys" as the term is used in Heading 9503, HTSUS, because they satisfy the five-factor test that this Court established in *Streetsurfing*.

Before proceeding with the discussion of the *Streetsurfing* factors, Plaintiff notes that the Court in the *Streetsurfing* case analyzed the classification of a "waveboard," which is a non-motorized board that was propelled by the user's lower muscles, the stomach, and their legs. *See Streetsurfing*, 38 Ct. Int'l Trade at 1336. Thus, the Court derived the five-factor "wheeled toy" test in *Streetsurfing* in the context of predominantly examining the features and specifications of *non-motorized* items within the Explanatory Notes to Heading 9503, HTSUS. *See id.* at 1334-35.

While the Court should find in any circumstance that the five factors established in *Streetsurfing* support a determination that the Hoverboards are properly classified as "wheeled toys," Plaintiff asserts that the factors should be examined here in the context of a wheeled toy that is *motorized*. First, the Explanatory Notes to Heading 9503, HTSUS, specifically explain that "[o]ther types of wheeled toys may be … driven by a motor." In fact, one of the specific examples of a motorized wheeled toy in the Explanatory Notes to Heading 9503, HTSUS, is a

"[c]hildren's car[] ***powered by a motor***." Explanatory Notes to heading 9503, HTSUS (emphasis added).

As the Court in *Streetsurfing* noted, "a wheeled toy properly classifiable under HTSUS Heading 9503 is also characterized by other common features." *Streetsurfing*, 38 Ct. Int'l Trade at 1334. Plaintiff believes that any analysis of the *Streetsurfing* factors in this case should acknowledge the features and characteristics of *children's cars that are powered by a motor*, in light of the fact that Hoverboards are likewise powered by a motor.

For example, the *Streetsurfing* factors include the "absence of a training requirement" prior to use of a wheeled toy, and "the lack of acquired skill to fully utilize the item." In the context of a motorized children's car, these factors—while they need not be disregarded altogether—only make practical sense when they are considered from a relatively higher basis than might be the case for non-motorized wheeled toys. For example, user manuals for children's cars that are powered by a motor (see **Exhibit Q** and **R**) contain numerous instructions on safe handling and operation, as well as training and safety requirements that should be taught, before a child can use such cars. **Exhibit Q**, at 5, 12-14; **Exhibit R**, at 2, 11-12. The user manuals indicate that such cars must be used strictly under "direct adult supervision." **Exhibit Q**, at 12; **Exhibit R**, at 11.

In addition, the children's electric motor car manuals indicate that they require development of individual skills to allow for safe operation of such a car. Specifically, "skill is required to avoid falls or collisions causing injury to the user of third parties." **Exhibit R**, at 11. While riding such a car, the manuals warn that "[a] child could encounter unexpected obstacles and have an accident." **Exhibit Q**, at 12. *None of these facts would override the fact that*

children's cars are explicitly listed in the Explanatory Note as "wheeled toys" that are appropriately classified under Heading 9503, HTSUS.

As such, as the Court applies the five-factor "wheeled toy" *Streetsurfing* test, Plaintiff believes it is of great benefit for the Court to consider the specific characteristics and features of children's cars powered by a motor, which closely align with the characteristics of motorized Hoverboards. Plaintiff believes that these specific characteristics and features indicate that ***motorized wheeled toys*** of Heading 9503, HTSUS, may require a different level of training, may have a different base risk level of injury, and/or may require a different degree of skill for operation, as compared to non-motorized wheeled toys of Heading 9503, HTSUS.

To that effect, Plaintiff notes in sum that the United States Court of Appeals for the Federal Circuit has previously recognized that this Court is not bound to adhere to the same analysis from prior CIT decisions, and a judge is free to make her own decisions. *See Algoma Steel Corp., Ltd. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989). Analyzed within this context, Plaintiff's Hoverboards meet the five-factor *Streetsurfing* test as explained in more detail below.

### A.    Hoverboards Do Not Require Training Prior to Use

The Court in *Streetsurfing* described the first factor in determining whether an item is a "wheeled toy" of Heading 9503, HTSUS, as "the absence of a training requirement prior to its use." *Streetsurfing LLC*, 38 Ct. Int'l Trade at 1335.

In deciding that a waveboard was not a "wheeled toy", the Court explained that "riding the waveboard require[d] the coordination of a user's balance, steering, and propulsion in unison." *Id*. Also, "the waveboards [were] packaged with a tutorial video that demonstrate[d] how to safely ride the merchandise, and similar instructional material [was] also available on Streetsurfing's website." *Id*. "Streetsurfing employed professional instructors to visit thousands

22

of schools and teach millions of students how to ride its waveboards." *Id*. Thus, it became apparent to the Court that "unlike wheeled toys, riding waveboards require[d] more than merely stepping onto the device and setting off." *Id*.

Unlike waveboards, riding Hoverboards does not require more than merely stepping onto the device and setting off. **PSUF 15-18**. In fact, Defendant's representative, Mr. Dwayne Rawlings, agreed during a deposition that customer reviews indicate that Hoverboards are easy to use, and that even an eight-year-old can manage to get a hang of riding Hoverboards quickly. **PSUF 34, 35, 44, 47**. Riding a Hoverboard simply requires stepping on a platform and leaning forward. **PSUF 16-18**. Unlike waveboards, riding Hoverboards does not require the coordination of a user's balance, steering, and propulsion in unison. Rather, the gyroscope assists the rider with keeping the balance while the electric motor drives the Hoverboard. **PSUF 15-18**. The only thing that is left for the rider is to control the direction and speed of the Hoverboard with foot pressure on each of the foot treads. **PSUF 17**. This is also akin to operating a children's car powered by a motor where the rider only needs to control the direction and speed. See **Exhibits Q** and **R**.

Further, unlike waveboards, Hoverboards are not packaged with tutorial videos that demonstrate how to safely ride Hoverboards, and there is no similar instructional material on Swagtron's website. At most, Hoverboards packaging includes standard user manuals, which are consistent with the user manuals for other motorized wheeled toys of Heading 9503, HTSUS, such as children's cars powered by a motor. **PSUF 32**, Exhibits **Q** and **R**.

Finally, unlike the importer of waveboards in *Streetsurfing*, 3BTech does not employ professional instructors to visit schools and teach students how to ride Hoverboards. This is

23

because Hoverboards are relatively easy to use and do not require specialized training. **PSUF 34, 35, 44, 46, 47**.

Thus, the absence of a training requirement prior to the use of Hoverboards weighs in favor of classifying Hoverboards under Heading 9503, HTSUS, as wheeled toys.

### B.    The Use of Hoverboards Does Not Involve Any Meaningful Risk of Injury in Excess of Other Motorized Wheeled Toys

"Another distinctive characteristic of a wheeled toy under HTSUS Heading 9503 is that the item's use does not involve any meaningful risk of injury." *Streetsurfing*, 38 Ct. Int'l Trade at 1335. In *Streetsurfing*, the Court held that product labeling and other record evidence showed that "a waveboard's use carrie[d] a meaningful risk of injury that is lacking with the wheeled toy exemplars of HTSUS Heading 9503." *Id*.

Unlike in *Streetsurfing*, in this case, Defendant's representative, Mr. Dwayne Rawlings, confirmed during a deposition that the government is not aware of any meaningful risk of injury involved in the use of Hoverboards. **PSUF 45**.

Also, in *Streetsurfing* the Cout noted that "waveboards are prohibited in over ninety percent of the skate parks in the United States 'because they are dangerous in the parks.'" *Id*. Plaintiff acknowledges that Hoverboards are prohibited in certain states on public roads or even on the sidewalks or pavements. **PSUF 31**. However, such prohibition is consistent with the prohibitions issued on other motorized wheeled toys of Heading 9503, HTSUS, such as children's cars powered by a motor. For example, Phoenix, AZ, prohibits the use of "toy vehicles" on "any roadway or lot used for vehicular travel or parking." See **Exhibit S**. Likewise, Worth, IL, prohibits use of "toy vehicles … upon any roadway other than at a crosswalk." See **Exhibit T**. As such, this prohibition is consistent with the general municipal safety standards implemented for motorized wheeled toys (toy vehicles) of Heading 9503, HTSUS, and is *not*

indicative of the Hoverboards presenting some outsized risk of injury relative to other motorized wheeled toys.

Further, in *Streetsurfing*, the Court noted that "The Wave itself and the box in which it [was] packaged and sold state[d] that the merchandise contain[ed] a safety manual that should be read prior to its use, that protective gear should be worn at all times, and that adult supervision is required." *Streetsurfing*, 38 Ct. Int'l Trade at 1335. Plaintiff acknowledges that Hoverboards contain user manuals that outline certain safety instructions and recommendations, as well as use hazards. **PSUF 32**. However, those user manuals are in line with user manuals used for other motorized wheeled toys of Heading 9503, HTSUS, such as children's cars powered by a motor. For examples, user manuals for children's cars powered by a motor instruct the use of protective equipment while riding, wearing helmets, operating under direct adult supervision, ensuring that children follow all warnings, cautions, and instructions to ensure young riders are able to safely use the product, and explaining that use or misuse of these toys can result in serious injury or even death. See **Exhibits Q** and **R**. As such, Hoverboard user manuals are consistent with user manuals for motorized wheeled toys of Heading 9503, HTSUS.

Thus, Hoverboards do not involve any meaningful risk of injury that is outsized relative to other motorized wheeled toys of Heading 9503, HTSUS, further indicating that Hoverboards fall within the realm of what constitutes a "wheeled toy."

### C.    The Users Need Not Develop a Degree of Skill to Fully Utilize Hoverboards

The next *Streetsurfing* criteria to classify an item as a wheeled toy is "the lack of acquired skill to fully utilize the item." *Streetsurfing*, 38 Ct. Int'l Trade at 1335. In *Streetsurfing* the Court found that waveboards "require[d] that a user acquire a certain level of skill to fully use the merchandise." *Id.* at 1336. Specifically, "as with a skateboard, users need[ed] considerable skill

and experience in order to develop their technique and master the use of the waveboards in order to be able to perform 'tricks' or 'stunts.'" *Id*. That is not the case with Hoverboards.

Riding Hoverboards does not require more than merely stepping onto the device and setting off. **PSUF 15-18**. User manuals provide very simple instructions:

STEP 1: Press the POWER BUTTON to turn on your SWAGTRON® unit.

STEP 2: Step on one PEDAL to trigger the foot-switch. The system will enter self-balancing mode. Then step on the second pedal with your other foot quickly.

STEP 3: Stand upright but relaxed. Do not make any sudden or jerking movements.

**Exhibit J-1**, at 15. User manuals also note that "[t]he [Hoverboard] has 4 sensors below the pedals [and w]hen the rider steps on a pedal, the ***[Hoverboard] will adjust itself to balance automatically***." Going forward or backward simply requires shifting body weight and leaning forward or backward within ten degrees. **Exhibit J-1**, at 17. To stop, the user simply leans backward and then aligns their body to an upright straight position. **Exhibit J-1**, at 17. Finally, turning left or right only requires the rider to lean their body slightly left or right and shift their weight slightly off the pedal. **Exhibit J-1**, at 17-18. These instructions indicate that riding a Hoverboard simply requires the ability to slightly lean forward, backward, and sideways and the rest of the balancing and propulsion is completed by the Hoverboard itself with the use of gyroscope and the motor.

Thus, record evidence clearly demonstrates that users need not develop any degree of skill to fully utilize Hoverboards, further showing that classification of the merchandise under HTSUS Heading 9503 as a wheeled toy is proper.

Plaintiff also notes that even though Hoverboards do not require any skill to fully utilize them, motorized wheeled toys of Heading 9503, HTSUS, may require such skill to a certain

26

degree. For example, children's cars powered by a motor require development of individual skills to master driving such a car. Specifically, "skill is required to avoid falls or collisions causing injury to the user of third parties." **Exhibit R**, at 11. There are rigorous operating features that need to be taught to a child before operation. **Exhibit Q**, at 12-13. While riding such a car, "[a] child could encounter unexpected obstacles and have an accident." **Exhibit Q**, at 12. As such, even if this Court finds that there is certain degree of skill to fully utilize a Hoverboard it would not disqualify it from being a wheeled toy of Heading 9503, HTSUS, because motorized wheeled toys of Heading 9503, HTSUS, may require a degree of skill to fully utilize them.

### D.    There is No Exercise or Athletic Aspect in the Use of Hoverboards

The next factor characterizing wheeled toys of Heading 9503, HTSUS, is "the lack of exercise or athletic aspect in the item's use." *Streetsurfing LLC*, 38 Ct. Int'l Trade at 1335. In *Streetsurfing*, the Court reasoned that wheeled toys "d[id] not provide their user with a workout." *Id*. at 1336. However, "[t]he waveboards' users … g[o]t good exercise, working their lower muscles, the stomach and their legs." *Id*. (internal citation omitted). Moreover, waveboards were introduced "to thousands of schools as part of the schools' physical education programs, because the waveboards [were] a physical activity teaching students a new skill that works on core stability utilizing balance, weight transfer, and movement through space." *Id*.

Unlike waveboards, Hoverboards do not provide their user with a workout. Defendant's representative, Mr. Dwayne Rawlings, agreed that there is no exercise or athletic aspect in riding the Hoverboard. **PSUF 48**. As explained above, the user of the Hoverboard is only required to slightly lean forward, backward, or sideways to operate the hoverboard. **PSUF 15-18**, **Exhibit J-1**, at 17-18. The rest of the operation (*i.e.*, balancing and propulsion) is completed by the Hoverboard itself with the use of gyroscope and the motor. Finally, unlike waveboards,

Hoverboards were never introduced to school programs and were not designated to provide an educating physical activity.

As such, because Hoverboards do not afford users any degree of exercise or physical activity classification as a wheeled toy under HTSUS Heading 9503 is appropriate.

### E.    Hoverboards Are Equipped with Assistive Devices

The last criterion to qualify as a wheeled toy of Heading 9503, HTSUS, is "the presence of an assistive device." *Streetsurfing*, 38 Ct. Int'l Trade at 1335. The Court in *Streetsurfing* explained (referencing Explanatory Notes to Heading 9503, HTSUS) that such wheeled toys are designed for propulsion by means of various assistive devices, including "[o]ther types of wheeled toys … simply … driven by a motor." It follows that the Court regarded a motor as an assistive device. This is also an example of how the Hoverboards are analogous to children's cars in the Explanatory Notes' list of "wheeled toy" examples; children's electric motor cars are equipped with a battery-operated electric motor that serves as an assistive device in those toys' use. **Exhibit Q**, at 14-15; **Exhibit R**, at 14-15.

In *Streetsurfing*, the Court found that waveboards did not "possess pedals, hand levers, or any other device that transmits power to the wheels," and that the waveboard was propelled simply by the riders' body movement. *Id*. at 1337. However, unlike the waveboards analyzed in the *Streetsurfing* case, Hoverboards are equipped with motors, which serve as assistive devices and propel the Hoverboard. **PSUF 15, 28, 49, 60, 77**. Moreover, Hoverboards are equipped with gyroscopes, which assist riders with balancing the Hoverboard. **PSUF 18, 49, 60, 77**. Both the motor and the gyroscope are clearly "assistive devices" that are designed and intended to help the user of the Hoverboard maintain propulsion and balance. This has also been confirmed by Defendant's representative, Mr. Dwayne Rawlings, and Defendant's experts, Mr. Bert Reiner and Mr. Edward Benjamin, in their depositions. **PSUF 49, 60, 77**. Thus, this factor likewise

weighs heavily in favor of classifying Hoverboards as "wheeled toys" under Heading 9503, HTSUS.

Because Hoverboards are principally used as toys for amusement, diversion, and play, rather than practicality and meet all five factors established in *Streetsurfing*, Hoverboards are properly classified as wheeled toys of Heading 9503, HTSUS.

### III. Hoverboards are Further Classified Under Subheading 9503.00.0090

On the subheading level, Hoverboards are properly classified under subheading 9503.00.0090, HTSUS, as "Tricycles, scooters, pedal cars and ***similar wheeled toys***; dolls' carriages; dolls, other toys; reduced-scale ('scale') models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof: ***Other***." Emphasis added.

Specifically, within Heading 9503, HTSUS, subheadings 9503.00.0011 through 9503.00.0073 cover items that are "'Children's products' as defined in 15 U.S.C. § 2052." The term "children's product" is defined in 15 U.S.C. § 2052 as "a consumer product designed or intended primarily for children 12 years of age or younger." Hoverboards are not designed or intended primarily for children 12 years of age or younger. Thus, Hoverboards are not considered "children's products" as defined in 15 U.S.C. § 2052. It follows that Hoverboards cannot be classified under any of the subheadings 9503.00.0011 through 9503.00.0073, HTSUS.

As such, the only subheading left to properly classify Hoverboards is 9503.00.0090, HTSUS, which specifically provides for "Tricycles, scooters, pedal cars and ***similar wheeled toys***; dolls' carriages; dolls, other toys; reduced-scale ('scale') models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof: ***Other***." Emphasis added.

## IV.    Hoverboards Cannot be Classified as "Transportation Devices" of Heading 8711, HTSUS

Defendant's position appears to be that Hoverboards should be classified under one of the statistical provisions of subheading 8711.60.00, HTSUS. Heading 8711, HTSUS, specifically provides for "Motorcycles (including mopeds) and cycles fitted with an auxiliary motor, with or without side-cars; side-cars." Plaintiff's understanding of Defendant's argument is that the Hoverboards would fall under the umbrella of "motorcycles (including mopeds)"; the electric motor in the Hoverboards is the primary means of propulsion, and thus could not be reasonably construed to be an "auxiliary" motor.[1]

As noted earlier, this argument fails based on a plain reading of the relevant Section and Chapter Notes, as required under GRI 1. Section Note 1 to HTSUS Section XVII—which includes articles of Chapter 87—states that "[t]his section *does not cover articles of heading 9503* or 9508, or sleds, bobsleds, toboggans or the like of heading 9506" (emphasis added). The Section Notes thus instruct that merchandise that is properly classified as a wheeled toy under Heading 9503 cannot be classified as a motorized cycle under Heading 8711.

Furthermore, Chapter Note 4 to HTSUS Chapter 87 provides that children's bicycles are to be classified in heading 8712, and that all "*[o]ther children's cycles fall in heading 9503*" (emphasis added). As demonstrated throughout this brief, the Hoverboards are properly characterized as articles used by, designed, intended, and marketed for children. For Heading 8711, HTSUS, to be potentially applicable, this Court must conclude that the Hoverboards are

---

[1]    The Merriam-Webster definition of "auxiliary" is "functioning in a subsidiary capacity," akin to providing a supportive role in a product's overall function, such as a small electric motor in an e-bike that is primarily manually powered. *See https://www.merriam-webster.com/dictionary/auxiliary* (last visited July 11, 2024).

*not* "wheeled toys" classified under Heading 9503, and the evidence in this case overwhelmingly demonstrates that they are.

Even if the Court were to compare Headings 8711 and 9503 on equal footing, which the Section and Chapter Notes again clearly instruct it should not, Hoverboards do not fall under the terms of Heading 8711, HTSUS. This, too, can be demonstrated from an examination of the relevant Explanatory Notes to Heading 87.11, HTSUS. The relevant Explanatory Note states that "[t]his heading covers a group of two-wheeled motorised {sic} vehicles which are essentially designed for carrying persons." As established above, Hoverboards are not vehicles and are principally used as toys for diversion, amusement, and play, rather than practicality. Thus, Hoverboards fall short of being classified as "motorized vehicles" under Heading 8711, HTSUS, pursuant to this Explanator Note.

The Explanatory Note to Heading 87.11, HTSUS, further states as follows:

> This heading also covers two-wheeled, electrically-powered *transportation devices*, designed for carrying a single person, for use within low speed areas such as pavements (sidewalks), paths, and bicycle lanes. Their technology allows the rider to stand upright while a system composed of gyroscope sensors and multiple onboard microprocessors maintains both the device's and rider's balance on two independent, non-tandem wheels.

*Emphasis added.*

Notwithstanding any preliminary temptations in drawing parallels from this Explanatory Note, there are several clear reasons why this Note does *not* describe Hoverboards. Notably, as explained below, this Explanatory Note had been drafted *well before Hoverboards were invented*, and thus the Note could not have possibly referred specifically to Hoverboards. **PSUF 50-51**.

Beyond this, the first sentence of this Explanatory Note refers to "transportation devices." As Plaintiff explained in Section I, above, Hoverboards are in no way a practical means of

transportation. **PSUF 29-30, 42**. Hoverboards are not designed to travel substantial distances or at significant speeds, the motors that serve as the primary propulsion mechanism are powered by batteries with a limited capacity, Hoverboards are incapable of lasting a significant distance on a single charge, and there are no reasonable means by which the batteries can be recharged outside of the home. *See* **Exhibit A**, Product Catalog; **PSUF 36**. Moreover, Hoverboards are not equipped with emergency brakes, shocks, headlights, taillights, and horns, which are in general essential for transportation devices. **PSUF 21**. Rather, Hoverboards are used for diversion, amusement, and play. Thus, the first sentence does not apply to Hoverboards.

Second, the product envisioned in the language of the second sentence encompasses a larger and more practical device that is actually used for transportation – the "Segway" or "human transporter." **Exhibit G**, Protest 3901-20-106024, at 7-8. Specifically, Defendant's representative, Mr. Dwayne Rawlings, confirmed that this Explanatory Note language had existed in 2007—well before Hoverboards were developed in 2012—and thus the language could not possibly have referred to or contemplated Hoverboards. **PSUF 50-51**. However, the Segway (human transporter) *did* exist in 2007, and it was presumably the device that was envisioned in the description provided in this Explanatory Note. Unlike Hoverboards, Segways are actually designed and used for transportation. **Exhibit G**, Protest 3901-20-106024, at 7-8. Segways are significantly larger, significantly more powerful, significantly heavier, with significantly larger maximum range, much higher top speed, and significantly larger tiers as compared to Hoverboards. **Exhibit G**, Protest 3901-20-106024, at 7-8. In fact, Defendant's representative, Mr. Dwayne Rawlings, confirmed in his deposition that "[t]his [Explanatory Note] is not referring to Hoverboard, and, no, it is not necessarily referring to your client's

Hoverboard." **Exhibit K**, at 192:3-5. It follows that this Explanatory Note likewise does not describe Hoverboards.

In summary, neither the terms of Heading 8711, HTSUS, nor the relevant Explanatory Notes to Heading 8711, HTSUS, describe Hoverboards. Given this, along with the far more determinative instructions set forth in the relevant Section and Chapter Notes discussed above, this Court should conclude that Hoverboards are not classified under Heading 8711, HTSUS.

**V.    If the Court Determines That Hoverboards are Properly Classified Under Subheading 8711.60.00, HTSUS, Hoverboards Are Also Classified Under Heading 9903.88.17, HTSUS duty- and tariff-free**

If the Court determines that Hoverboards are properly classified under subheading 8711.60.00, HTSUS, it must also find that the Hoverboards satisfy the description of one or more Section 301 exclusions described in Heading 9903.88.17, U.S. Note 20(v) to Chapter 99, HTSUS:

- (86) Motorcycles with electric power for propulsion, each of a power not exceeding 1,000 W (described in statistical reporting numbers 8711.60.0050 or 8711.60.0090); and/or

- (87) Skateboards with electric power for propulsion, of a power not exceeding 250 W (described in statistical reporting number 8711.60.0050).

*See Exclusion Notice*, 84 Fed. Reg. at 49,609. Both exclusions referenced above were available for articles entered into the United States between August 23, 2018, and September 20, 2020 (*see id.*, at 49,600), which covers the dates of entry of the Subject Merchandise. **PSUF 4**. The *Exclusion Notice* specifically provides as follows:

> In accordance with the September 18 notice, ***the exclusions are available for any product that meets the description in the Annex***, regardless of whether the importer filed an exclusion request. Further, ***the scope of each exclusion is governed by the scope of the product descriptions in the Annex***…

84 Fed. Reg. at 49,601 (emphasis added).

The exclusion in Note 20(v)(86) sets forth four conditions to qualify: (1) the articles must be "motorcycles"; (2) the articles must have "electric power for propulsion"; (3) the articles must operate at a "power not exceeding 1,000 W"; and (4) the articles must "be described in statistical reporting numbers 8711.60.0050 or 8711.60.0090." All four conditions are met here.

First, if the Court determines that the Hoverboards are classified under Heading 8711.60.00, that satisfies both the first and the fourth conditions. The classification condition is self-evident, and the Court would necessarily be holding that the Hoverboards fall within the description of "motorcycles" that is used both in that Heading and in Chapter 99, Note 20(v)(86). The initial part of Heading 8711 provides for two categories of goods: (1) "Motorcycles (including mopeds)"; and (2) other "cycles fitted with an auxiliary motor." As discussed earlier, the motors in the Hoverboards are not "auxiliary"; they serve as the primary means of propulsion for the user. They must therefore fall, if classified in Heading 8711, HTSUS, for tariff purposes, under the collective umbrella of articles described as "motorcycles" as used in both Heading 8711 and in Note 20(v)(86) of Chapter 99, HTSUS.

Next, the "motorized" functionality of the Hoverboards is based on electric motors that are powered by a battery, **PSUF 15**, which satisfies the condition of using "electric power for propulsion." Furthermore, the electric motors in Plantiff's Hoverboards operate at a power of less than 1,000 watts (**PSUF 28**), which is the final conditional requirement. As such, the Hoverboards meet the description of, and thus may be considered to fall within the class or kind of, articles encompassed by heading 9903.88.17, U.S. Note 20(v)(86) to Chapter 99, HTSUS.

Alternatively, Hoverboards may also meet the description of articles that are excluded from Section 301 duties that are described in Note 20(v)(87) to Chapter 99, HTSUS. This

exclusion sets forth four conditions to qualify: (1) the articles must be "skateboards"; (2) the articles must have "electric power for propulsion"; (3) the articles must operate at a "power not exceeding 250 W"; and (4) the articles must "be described in statistical reporting number 8711.60.0050."

The term "skateboards" is not defined in Note 20 or elsewhere in the HTSUS. However, based on the common and commercial meaning of the term, the Hoverboards may reasonably be described in such a manner. Like skateboards, Hoverboards are short, inflexible boards mounted with wheels at each end, on which a person rides in a standing or crouching position. Furthermore, the Hoverboards are unquestionably motorized with "electric power for propulsion." And, with the exception of the 300-watt motors used in the Swagtron T6, *see* **PSUF 28**, the Hoverboards' motors all operate at a power not exceeding 250 watts. As such, the Hoverboards meet the description of, and thus may be considered to fall within the class or kind of, articles encompassed by Heading 9903.88.17, U.S. Note 20(v)(87) to Chapter 99, HTSUS.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff, 3BTech, Inc., respectfully submits that summary judgment should be entered in its favor, classifying the Subject Merchandise under subheading 9503.00.0090, HTSUS, duty- and tariff-free. Alternatively, if the Court determines that the Subject Merchandise is properly classified under subheading 8711.60.00, HTSUS, the Subject Merchandise should also be classified under Heading 9903.88.17, HTSUS, duty- and tariff-free.

Respectfully submitted,

Dated:   July 12, 2024    

_____
Serhiy Kiyasov, Attorney

Lawrence R. Pilon
Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Plaintiff 3BTech, Inc.*

## **CERTIFICATE OF COMPLIANCE**

I, Serhiy Kiyasov, hereby certify that this brief complies with the 14,000 word-count limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) because this brief contains 10,290 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted,

Dated: ___July 12, 2024___

_____
Serhiy Kiyasov, Attorney

Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Plaintiff 3BTech, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Serhiy Kiyasov, one of the attorneys for the plaintiff, certify that copies of the Plaintiff

3BTech, Inc.'s Motion for Summary Judgement and Memorandum in Support thereof,

Declaration of Counsel, Statement of Undisputed Material Facts, and Exhibits were served on all

parties by filing a copy via the U.S. Court of International Trade's CM/ECF System this Friday,

July 12, 2024.


Respectfully submitted,

Dated:     July 12, 2024

_____
Serhiy Kiyasov, Attorney

Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Plaintiff 3BTech, Inc.*