**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| 3BTECH, INC.,<br><br>　　　　　　　*Plaintiff,*<br>　　　　v.<br><br>UNITED STATES,<br><br>　　　　　　　*Defendant.* | **Court No.  21-cv-00026** |

## <u>PROPOSED ORDER</u>

Upon consideration of Plaintiff's Motion To Strike Defendant's Expert Declarations, Mr. Sullivan's Declaration and Attachments Thereto, Defendant's Additional Rule 56.3 Statement, Amendments To The Compendium Of Classification Opinions, And The World Customs Organization Classification Opinions And Motion For Attorney's Fees And Expenses, and all of the pleadings and papers on file herein, and after due deliberation, it is hereby —

**ORDERED** that Plaintiff's motion is granted; and it is further

**ORDERED** that Defendant's Expert Declarations (**ECF Nos. 37-2** and **37-3**) are stricken; and it is further

**ORDERED** that Mr. Sullivan's Declaration (**ECF No. 37-1**) and attachments thereto are stricken; and it is further

**ORDERED** that Defendant's Additional Rule 56.3 Statement (**ECF No. 36-2**) is stricken, and it is further

**ORDERED** that the Amendments to the Compendium of Classification Opinions (**ECF No. 37-8**) are stricken; and it is further

**ORDERED** that WCO Classification Opinions (**ECF No. 37-9** and **ECF No. 36, pp. 106-112**) are stricken; and it is further

**ORDERED** that Plaintiff be awarded reasonable attorney's fees and expenses and such other additional relief as this Court deems just and appropriate

_____

HON. JANE A. RESTANI, JUDGE

Dated: New York, New York

This _____day of _____, 2024.

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**

| | |
|---|---|
| 3BTECH, INC., | |
| *Plaintiff,* | |
| v. | **Court No.  21-cv-00026** |
| UNITED STATES, | |
| *Defendant.* | |

**PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S EXPERT DECLARATIONS, MR. SULLIVAN'S DECLARATION AND ATTACHMENTS THERETO, DEFENDANT'S ADDITIONAL RULE 56.3 STATEMENT, AMENDMENTS TO THE COMPENDIUM OF CLASSIFICATION OPINIONS, AND THE WORLD CUSTOMS ORGANIZATION CLASSIFICATION OPINIONS AND MOTION FOR ATTORNEY'S FEES AND EXPENSES**

In accordance with Rules 12, 26, and 37 of the Rules of the United States Court of International Trade ("USCIT"), Plaintiff, 3BTech, Inc. ("3BTech"), hereby moves this Court to strike the Declaration of Norbert (Bert) Reiner (**ECF No. 37-2**) and the Declaration of Edward Benjamin (**ECF No. 37-3**) (referred to collectively hereafter as "Expert Declarations") as additional expert reports produced after the Court-ordered deadline, after experts had been deposed, after general and expert discovery had concluded, and after Plaintiff had filed its Motion for Summary Judgment (**ECF No. 31**). Plaintiff also respectfully requests that the Court strike Defendant's Additional Rule 56.3 Statement (**ECF No. 36-2**) for the reasons explained more fully below. Further, Plaintiff respectfully requests that the Court additionally strike the Declaration of Mr. Matthew Sullivan and the attachments thereto (**ECF No. 37-1**), as well as the Amendments to the Compendium of Classification Opinions (**ECF No. 37-8**) and the World Customs Organization Classification Opinions (**ECF No. 37-9**). Finally, Plaintiff respectfully requests that the Court award Plaintiff the reasonable expenses and attorney's fees associated with its efforts to resolve this dispute and draft this motion.

Plaintiff attempted to amicably resolve the issues raised in this motion with Defendant before filing this motion by contacting Defendant's counsel, Ms. Mikki Cottet, on September 27, 2024. However, Defendant's counsel, Ms. Mikki Cottet, refused to resolve these issues and declined to withdraw the filings indicated in this motion.

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff filed its Motion for Summary Judgment on July 12, 2024. *See* **ECF No. 31**. Defendant filed its Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment (**ECF No. 36**) ("Defendant's Cross-Motion") on September 4, 2024, after this Court had extended Defendant's deadline several times (*see* **ECF Nos. 33** and **35**) from the original August 16, 2024, deadline.

Defendant's Cross-Motion referred to several exhibits, including the expert declarations of Mr. Norbert (Bert) Reiner (**ECF No. 37-2**) and Mr. Edward Benjamin (**ECF No. 37-3**). Mr. Reiner's expert declaration is dated August 26, 2024, (**ECF No. 37-2** at 14) and contains thirty-seven (37) individual paragraphs with multiple additional sub-paragraphs. Mr. Benjamin's expert declaration is likewise dated August 26, 2024, (**ECF No. 37-3** at 11) and contains thirty-one (31) paragraphs. The Court-ordered deadline to submit expert reports was November 6, 2023. **ECF No. 23**. As such, the Expert Declarations were not produced until three hundred and three (303) days after the Court-ordered deadline to submit expert reports.[1]

Defendant produced the initial expert reports of Mr. Reiner and Mr. Benjamin to Plaintiff via email on November 6, 2024 (referred to collectively hereafter as "Initial Expert Reports"). *See* **Exhibit ("Ex.") A** (Mr. Reiner's Initial Expert Report) and **Ex. B** (Mr. Benjamin's Initial Expert Report). However, Defendant opted to forego the Initial Expert Reports and neither relies on nor

---

[1] Even though both Expert Declarations are dated August 26, 2024, they were produced by Defendant to Plaintiff and this Court on September 4, 2024, along with Defendant's Cross-Motion.

references the Initial Expert Reports in Defendant's Cross-Motion. Should Defendant attempt to introduce the Initial Expert Reports, Plaintiff intends to request that this Court strike both Initial Expert Reports, or, alternatively, Plaintiff intends to object to the introduction of the Initial Expert Reports, on the basis that will be explained should it be required.

Plaintiff produced rebuttal expert reports to Mr. Reiner's and Mr. Benjamin's Initial Expert Reports prepared by Mr. Stephen Velte on March 4, 2024. *See* **ECF Nos. 31-19** and **31-20**. Subsequently, Mr. Reiner was deposed on April 5, 2024, Mr. Benjamin was deposed on April 11, 2024, and Mr. Velte was deposed on April 12, 2024. This concluded general and expert discovery in this case.

Defendant's attempt to introduce the Expert Declarations that are, in fact, additional expert reports, should not and cannot be allowed at this late stage after the Court-ordered deadline to produce expert reports had passed, after experts had been deposed, after general and expert discovery had concluded, and, especially, after Plaintiff had already filed its Motion for Summary Judgment. As more fully explained below, the untimely Expert Declarations are in essence disguised additional expert reports that introduce new reasoning, employ new methodologies, and offer new conclusions, which were not disclosed in the Initial Expert Reports. As such, this Court must strike the Expert Declarations.

Defendant's Cross-Motion further relies on the Declaration of Mr. Matthew Sullivan ("Mr. Sullivan's Declaration"), CBP National Import Specialist, and the attachments thereto. *See* **ECF No. 37-1**. Mr. Sullivan's Declaration was executed on August 29, 2024, nearly one full year after the Court-ordered discovery deadline of August 24, 2023, thus depriving Plaintiff of an opportunity to examine Mr. Sullivan's findings or depose him to corroborate his conclusions. *Id.* at 9; **ECF No. 23**. Therefore, this Court must also strike Mr. Sullivan's Declaration and the

attachments thereto because they were produced after discovery had concluded and Plaintiff had already filed its Motion for Summary Judgment.

If this Court strikes the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, this Court must also strike Defendant's Additional Rule 56.3 Statement (**ECF No. 36-2**) ("Defendant's Statement of Facts") because Defendant's Statement of Facts relies almost entirely on the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto as more fully explained *infra*.

Furthermore, Defendant's Cross-Motion also draws support from the Amendments to the Compendium of Classification Opinions ("Amendments") (**ECF No. 37-8**) and the World Customs Organization ("WCO") Classification Opinions (**ECF No. 37-9**). Although these documents were created in 2017 and 2018, respectively, Defendant never introduced them during discovery or at any other time prior to their use in Defendant's Cross-Motion. As such, the Amendments and the WCO Classification Opinions must also be stricken.

Finally, due to Defendant's willful violation of its disclosure obligations imposed by this Court's scheduling orders, this Court must also award Plaintiff the reasonable expenses and attorney's fees associated with its efforts to resolve this dispute and draft this motion.

## II. ARGUMENT

### A. Expert Declarations Are Essentially Additional Expert Reports and Must be Stricken

USCIT Rule 26(a)(2)(A) "*Disclosure of Expert Testimony*" requires that "a party … disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Further, "this disclosure must be accompanied by a written report prepared and signed by the witness." USCIT Rule 26(a)(2)(B). Such an expert witness report must include "a complete statement of all opinions the witness will express and the

basis and reasons for them." *Lilley v. CVS Health*, No. 17-515 KG/JHR, 2019 U.S. Dist. LEXIS 47985, *10 (D.N.M. Mar. 22, 2019); USCIT Rule 26(a)(2)(B)(i). Finally, USCIT Rule 26(e) imposes a duty on expert witnesses to supplement the report if the expert witness "learns that in some material respect the disclosure ... is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties." *Lilley*, 2019 U.S. Dist. LEXIS 47985, at 10.

If a party fails to timely disclose expert testimony or to supplement expert information, "the party is not allowed to use that information ... on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *Lilley*, 2019 U.S. Dist. LEXIS 47985, at 9-10; USCIT Rule 37(c)(1). The "timeliness" of a supplement under USCIT Rule 26(e) should be considered in the context of the Court's Scheduling Order. *See, e.g., Bowman v. R.L. Young, Inc.*, No. 21-1071, 2022 U.S. Dist. LEXIS 157997, at *8 (E.D. La. Sep. 1, 2022) ("By allowing a backdoor end-around the deadlines set forth in the Scheduling Order, this Court would be undermining the very purpose Fed. R. Civ. P. 26(e) serves in the first place."). As discussed in detail *infra*, Defendant failed to timely disclose expert testimony contained in the Expert Declarations by the Court-ordered November 6, 2023, deadline or properly supplement the Initial Expert Reports, and such failure is not substantially justified or harmless. As such, Defendant must not be allowed to use the Expert Declarations in support of Defendant's Cross-Motion and the Expert Declarations must be stricken.

In *Lilley*, defendant asserted that expert witness could not form the bases for her opinions "after the expert and her opinions are disclosed," especially when the additional expert affidavit was filed "well after the expert disclosure deadline … expired." *Lilley*, 2019 U.S. Dist. LEXIS 47985, at 9. Specifically, the defendant in *Lilley* contended that an "affidavit [was] an untimely

expert report, not a supplement to the December 7, 2017, report that attempt[ed] to cure the deficiencies in that report." *Id.* at 9-10 (in turn citing to Fed. R. Civ. P. 37(c)(1) (stating that if party fails to timely disclose expert testimony or to supplement expert information, "the party is not allowed to use that information ... on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless"); Fed. R. Civ. P. 26(a)(2)(B)(i) (requiring expert witness report to include "a complete statement of all opinions the witness will express and the basis and reasons for them"); Fed. R. Civ. P. 26(e) (imposing duty on expert witness to supplement report if expert witness "learns that in some material respect the disclosure ... is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties").

The Court in *Lilley* was guided by *In re Cent. European Indus. Dev. Co.*, which addressed the question of whether an affidavit or declaration that tries to cure deficiencies in an initial expert report should be treated as a Rule 26(e) supplement to an initial report or as a subsequent untimely expert report. *Id.* at 10; (in turn citing *Oliner v. Kontrabecki (In re Cent. European Indus. Dev. Co., LLC)*, 427 B.R. 149, 157 (Bankr. N.D. Cal. 2009) (observing that *if a declaration is an expert report, then "filing an undisclosed expert report long after the deadline is an improper attempt to circumvent the expert discovery schedule established by this court"*)) (emphasis added). The court in *In re Cent. European Indus. Dev. Co.* explained:

> If the Declaration is viewed as a "supplement" setting forth information, reasoning and opinions in order to cure that part of her Report's deficiencies, Rule 26 required such things to be disclosed in her critical initial Report. "The purpose of ... supplementary disclosures is just that—... to supplement. *These disclosures are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information*."

*Lilley*, 2019 U.S. Dist. LEXIS 47985, at 10-11; *Oliner*, 427 B.R. at 157 (emphasis added).

6

The court in *Baratto v. Brushstrokes Fine Art, Inc.*, explained that supplementation under

Rule 26(e) "is intended to provide parties an opportunity to correct mistakes and oversights, not to

include new examples and illustrations that could have been included in an original expert report."

*Lilley*, 2019 U.S. Dist. LEXIS 47985, at 11; *Baratto v. Brushstrokes Fine Art, Inc.*, 701 F. Supp.

2d 1068, 1071 (W.D. Wis. 2010).

> Further discussing *Baratto*, the court in *Diaz v. Con-Way Truckload, Inc.*, stated as follows:
>
> Permissible supplementation of an expert report and disclosures can only occur in
> certain limited circumstances. Specifically, those circumstances are when the party
> or expert learns the information previously disclosed is incomplete or incorrect in
> some material respect. Moreover, permissible supplementation means correcting
> inaccuracies, or filling the interstices of an incomplete report ***based on information***
> ***that was not available at the time of the initial disclosure***. The basic purpose of
> supplementary disclosures under Rule 26(e)(2) is to prevent prejudice or surprise,
> ***not to provide an extension of the expert designation and report production***
> ***deadline***.

279 F.R.D. 412, 421 (S.D. Tex. 2012) (internal citation omitted) (emphasis added); *Lilley*, 2019

U.S. Dist. LEXIS 47985, at 11.

> Finally, the court in *Spirit Aerosystems, Inc. v. SPS Techs., LLC* clarified that:
>
> A supplemental expert report may be excluded under Rule 37(c) if it states an
> ***additional opinion or seeks to strengthen an opinion expressed in the original***
> ***report***. Rule 26(e) may not be used to provide an extension of the expert report
> deadline or sandbag one's opponent with issues that should have included in the
> ***original report***.

2013 U.S. Dist. LEXIS 168696, 2013 WL 6196314, at *7 (D. Kan.) (emphasis added); *Lilley*, 2019

U.S. Dist. LEXIS 47985, at 11.

The court in *Lilley* (relying on *In re Cent. European Indus. Dev. Co.*, *Baratto v.*

*Brushstrokes Fine Art, Inc.*, and *Spirit Aerosystems, Inc. v. SPS Techs., LLC*) determined that the

expert affidavit submitted after the initial expert report deadline went beyond correcting a mistake

or oversight, or merely supplementing the initial expert report. *See Lilley*, 2019 U.S. Dist. LEXIS

47985, at 11. "Instead, the affidavit set[] forth a methodology and reasoning in an effort to strengthen [the initial expert] report and cure any deficiencies in that report." *Id.* Specifically, the initial expert report could have included additional factors listed in the untimely affidavit, methodologies for analyzing such factors, assessment of such factors, and the sources that the expert relied upon. *Id.* at 11-12. However, those factors were not included in the initial expert report and, thus, the expert was not deposed on these issues. *Id.* at 12. As such, the court concluded that the untimely affidavit unfairly prejudiced plaintiff and the court disregard the affidavit as "an untimely expert report." *Id.*

Further, in *Martinez v. Target Corp.*, the United States Court of Appeals for the Tenth Circuit upheld the decision of the United States District Court for the District of New Mexico striking plaintiff's untimely expert reports because the reports were not disclosed in accordance with the Federal Rules of Civil Procedure and were inadmissible under the Federal Rules of Evidence. 384 F. App'x 840, 847-48 (10th Cir. 2010).

Additionally, earlier this year, this Court concluded in *Ildico Inc. v. United States* that the untimely introduction of supplemental evidence was barred if it was made after the expiration of the discovery period. No. 18-00136, 2024 Ct. Intl. Trade LEXIS 9 (Ct. Int'l Trade Jan. 29, 2024). Specifically, this Court determined that supplementing disclosures after the close of discovery by introducing evidence containing additional, previously undisclosed information was improper. *Id.* Despite the supplementing party's argument that the additional information did not add any new or material information and thus only supplemented its original claims, its introduction placed the opposing party in the position of receiving information it could not probe. *Id.* As such, the supplementing party was not relieved of its duty to timely supplement its initial disclosures under Rules 26 and 37 and this Court denied its introduction. *Id.*

Finally, various federal courts have consistently held that "[a] motion to strike is the appropriate means of objection to the use of affidavit evidence on a motion for summary judgment." *See Facey v. Dickhaut*, 91 F.Supp.3d 12, 19 (D. Mass. 2014); *Turner v. Hubbard Sys.*, 153 F. Supp. 3d 493 (D. Mass. 2015); *HMC ASSETS, LLC v. Conley*, No. 14-10321-MBB, 2016 U.S. Dist. LEXIS 111594 (D. Mass. Aug. 22, 2016); *Deighan v. SuperMedia LLC*, No. 14-264 S, 2016 U.S. Dist. LEXIS 163983 (D.R.I. Nov. 29, 2016); *Plante & Moran, PLLC v. Andover Healthcare, Inc.*, Civil Action No. 17-10093-DJC, 2018 U.S. Dist. LEXIS 192937 (D. Mass. Nov. 13, 2018); *Heal v. Wells Fargo, Nat'l Ass'n*, 560 F. Supp. 3d 347 (D. Mass. 2021); *Schuster v. Wynn Resorts Holdings, LLC*, Civil Action No. 19-cv-11679-ADB, 2023 U.S. Dist. LEXIS 31708 (D. Mass. Feb. 27, 2023).

Similarly, in this case, Defendant attempts to introduce the untimely Expert Declarations that were produced three hundred and three (303) days after the Court-ordered deadline to produce expert reports had passed, after experts had been deposed, after general and expert discovery had concluded, and, especially, after Plaintiff had already filed its Motion for Summary Judgment. Moreover, Defendant does not rely on the Initial Expert Reports of Mr. Reiner and Mr. Benjamin in Defendant's Cross-Motion at all. Instead, Defendant fully relies on the untimely Expert Declarations that set forth new methodologies, reasoning, and conclusions in flagrant disregard of this Court's scheduling orders.

Mr. Reiner's Initial Expert Report (**Ex. A**) consisted of eight (8) pages and a resume. However, Mr. Reiner's untimely Expert Declaration consists of fourteen (14) pages totaling thirty-seven (37) individual paragraphs with multiple additional sub-paragraphs and additional attachments. **ECF No. 37-2**. Mr. Benjamin's Initial Expert Report (**Ex. B**) consisted of four (4)

pages and a resume. However, Mr. Benjamin's untimely Expert Declaration consists of eleven (11) pages totaling thirty-one (31) paragraphs and additional attachments. **ECF No. 37-3**.

Plaintiff also notes that during discovery, Defendant produced an email (*see* **Ex. C**) (Ms. Cottet Nov. 6 Email) dated Monday, November 06, 2023, 4:35:00 PM (just before the Initial Expert Reports were produced), authored by Defendant's counsel Ms. Mikki Cottet and addressed to Defendant's expert, Mr. Ed Benjamin, laying out the verbatim language that appears to be one of Mr. Benjamin's conclusions in his resulting Initial Expert Report (*see* **Ex. B** at 3).

The additional untimely Expert Declarations include the following new methodologies, reasoning, and conclusions, not disclosed in the Initial Expert Reports:

### Mr. Norbert (Bert) Reiner's Untimely Declaration:

- At ¶ 14 – Inclusion of "with/or without pedals" in the description of "ride-on" toys.
- At ¶ 15 – Introduction of definitions for four types of "ride-on" toys: (1) push toys; (2) ride-on toys; (3) pedal cars; and (4) Tricycles.
  - Mr. Reiner initially also groups "battery-operated tricycles" under the "ride-on" toy category but fails to specifically define it like he did with the above-mentioned four types of "ride-on" toys.
- At ¶ 16 – Introduction of three broad categories of scooters that were never previously discussed: (1) scooters that do not have a motor; (2) motorized scooters that are two-wheeled vehicles with a rechargeable battery; and (3) e-scooters.
- At ¶ 17 – Introduction and analysis of additional "common characteristics" amongst wheeled toys beyond those initially identified in relation to *Streetsurfing* case: (1) they do not involve exercise; and (2) they have one or more assistive devices, such as a seat, additional wheels, hand levers, handlebars or steering column, pedals, or brakes.
- At ¶ 17 – Additional conclusion added that "none of these wheeled toys require following traffic rules."
- At ¶ 19 – Additional conclusion (termed as Mr. Reiner's "understanding") that "wheeled toys are and have been designed, manufactured, and marketed for use by young children, usually between the ages of 12 months to eight years old."
- At ¶ 19 – Additional conclusion that "[w]heeled toys, such as tricycles, scooters, pedal cars are designed to help children with physical and cognitive development. These types of wheeled toys help children develop gross motor skills, coordination, and balance."
- At ¶ 21 – Introduction of labeling requirements for children's products under 15 U.S.C. § 2052(a)(2).
- At ¶ 21 – Introduction of Mr. Reiner's analysis of factors used to determine whether a product is a children's product under 16 C.F.R. § 1200.2.

- At ¶ 21 – Introduction of Mr. Reiner's analysis of mandatory toy safety standards' incorporation under 15 U.S.C. § 2056b.
- At ¶¶ 24 and 37 – Inconsistent definitions of whether hoverboards are equipped with just "motors" or "two motors."
  - Although Mr. Reiner initially (*see* ¶ 24) states that hoverboards "are equipped with gyroscopes and **motors**," he goes on (*see* ¶ 37) to match the language he used in his Expert Report (*see* page 5 of 9) that hoverboards are "equipped with a gyroscope and **two motors**."
- At ¶ 26 – Introduction of analysis/review of boxes and labeling.
- At ¶¶ 35-37 – Introduction of familiarity with Subheading 9503.00.00 and ENs 95.03.
- At ¶ 37 – Additional conclusion that "a gyroscope motor is not an assistive device of the kind found on wheeled toys."
- At ¶ 37 – Introduction of "acquired skills" discussion and how those skills ("steering and stopping…by shifting of the user's body weight") are "out of line with the skills of the children who use tricycles, scooters, pedal cars, and other wheeled toys."
- At ¶ 37 – Introduction of accusation that a "user must use the learning mode…"
  - In his Expert Report, Mr. Reiner only notes that the Swagtron instructions state: "Learning Mode is ideal for new or inexperienced riders."

**Mr. Edward Benjamin's Untimely Declaration:**

- At ¶ 3 – Additional conclusion that the Light Electric Vehicle (LEV) industry covers "one-to four-wheeled vehicles, cycles fitted with an auxiliary motor, and two-wheeled electric transportation devices designed for carrying a single person."
- At ¶ 3 – Additional conclusion that the following "vehicles" share the "same or similar components, operating paradigms, and use patterns": (1) one- to four-wheeled vehicles; (2) cycles fitted with an auxiliary motor; (3) two-wheeled electric transportation devices designed for carrying a single person; (4) self-balancing monowheel; (5) Segway; (6) electric bicycle; (7) electric skateboards; (8) electric scooters; (9) mopeds; (10) light electric motorcycles; and (11) hoverboards.
- At ¶ 9 – Additional conclusion that there is an "overlap between the bicycle and LEV industries."
- At ¶ 11 – Additional conclusion that the "micro-mobility vehicles industry encompasses both human powered and electrically powered vehicles that are used for transportation."
- At ¶ 11 – Additional conclusion that within the LEV industry, "LEVs are also referred to as e-mobility vehicles."
- At ¶ 11 – Additional conclusion that LEVs "are small as compared to electric vehicles and vehicles with internal combustion."
- At ¶ 11 – Additional conclusion that "LEVs are light in that they usually weigh less than 200 pounds."
- At ¶ 11 – Additional conclusion that "LEVs can have between one- and four wheels."
- At ¶ 11 – Additional conclusion that "LEVs use electric propulsion, meaning that they have an electric motor(s), a motor controller(s), a lithium battery, and human-machine interface(s) (sensors)."
- At ¶ 11 – Additional conclusion that "LEVs…do not have tandem wheels."

11

- At ¶ 12 – Introduction of different categories of LEVs: (1) electric bicycles; (2) scooters; and (3) personal transporters/human transporters.
- At ¶ 12 – Additional conclusion that "scooters" is a "catchall category" that includes: (1) electric mini scooters, upon which a single person stands upright and balances and controls the vehicle using a handle bar with a throttle; (2) the Yikebike, a portable, foldable electric scooter that resembles a penny farthing (a high wheel bicycle) in appearance with a larger front wheel and a smaller rear wheel; (3) the electric self-balancing monowheel; (4) mobility scooters, which are mobility assistance vehicles; and (5) electric motor scooters that resemble light motorcycles like the Vespa.
- At ¶ 13 – Additional conclusion that "LEVs all have similar componentry and operating paradigms."
- At ¶ 14 – Additional conclusion that "There are some differences in all varieties of LEV."
- At ¶ 14 – Additional conclusion that the different types of LEVs all have one to four wheels.
- At ¶ 14 – Additional conclusion that the different types of LEVs all have wheel sizes "ranging from approximately 2 to 29 inches."
- At ¶ 14 – Additional conclusion that the different types of LEVs operate at different maximum speeds.
- At ¶ 15 – Additional conclusion that "LEVs are not limited to use outdoors."
- At ¶ 15 – Additional conclusion that "LEVs are also used indoors."
- At ¶ 15 – Additional conclusion that many LEVs "can be used both indoors and outdoors."
- At ¶ 15 – Additional conclusion that "the bigger the wheel [of an LEV], the better the LEVs are at overcoming obstacles."
- At ¶¶ 19, 21-23, 28 – Additional conclusion that hoverboards are "personal transportation vehicles."
  - In Mr. Benjamin's Expert Report, he opines that the "hoverboards are electric micro mobility vehicles."
  - In his "Declaration," Mr. Benjamin now states that the hoverboards are "personal transportation vehicles."
- At ¶ 19 – Additional conclusion that hoverboards are not "motorcycles."
  - At no point in his Expert Report does Mr. Benjamin discuss "motorcycles."
- At ¶ 21 – Introduction of Mr. Benjamin's review of numerous previously unreviewed documents:
  - user manuals for model numbers T5, T6, T380, T500, T580, T588, and T881;
  - Swagtron® Design diagrams;
  - KY07 (Batteries) Description Report issued September 19, 2016, revised January 16, 2018;
  - SGS Certificate of Compliance #SGSNA/22/SZ/00097, issue date 2018-January-16;
  - Swagtron trademark registration;
  - Segway patent;
  - "numerous online articles";
  - "several YouTube videos".
- At ¶ 21 – Additional conclusion that hoverboards are "for use within low-speed areas such as pavements, paths, and bicycle lanes."
- At ¶ 22 – Introduction of Mr. Benjamin's role in his employment to "review patents when advising client[s]."

- At ¶ 22 – Additional conclusion that hoverboards are "modeled on the preexisting 'art' of the Segway patent for personal mobility vehicles."
- At ¶ 22 – Additional conclusion that hoverboards are "designed to be a smaller, portable version of the Segway."
- At ¶ 22 – Additional conclusion that hoverboards are "designed … with the same operating paradigm" as a Segway.
- At ¶ 24 – Introduction of Mr. Benjamin's review of Swagtron Design diagrams.
- At ¶ 25 – Additional conclusion that hoverboards "increased in popularity and use since the pandemic."
- At ¶ 25 – Introduction of Department of Energy study.
- At ¶ 25 – Additional conclusion that "it is practical for hoverboards to be used as personal transporters to travel short distances."
- At ¶ 26 – Introduction of YouTube video (*available at* https://www.youtube.com/watch?v=HGzszQ7zl8o).
- At ¶ 27 – Introduction of deposition materials, commentary on statements made during the deposition, and additional statements regrinding e-commerce and unidentified unknown factory.
- At ¶ 29 – Additional conclusion that hoverboards are not motorcycles and additional definition of a "motorcycle."
  - As noted above (*see* ¶ 19), Mr. Benjamin only begins discussing "motorcycles" in his declaration. As such, any definitions or conclusions drawn in relation to "motorcycles" were not previously introduced in his Expert Report.

Based on the foregoing, similarly to *Lilley*, in this case, the Expert Declarations submitted after the initial expert report deadline went beyond correcting mistakes or oversights, or merely supplementing the Initial Expert Reports. Instead, the untimely Expert Declarations set forth new methodologies, reasoning, and conclusions, specifically indicted *supra*, in an effort to strengthen the Initial Expert Reports and cure any deficiencies in those reports. USCIT Rule 26 requires such statements to be disclosed in the Initial Expert Reports. *Lilley*, 2019 U.S. Dist. LEXIS 47985, at 10 (internal citations omitted). Here, like in *Lilley*, the untimely Expert Declarations cannot be used "to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Lilley*, 2019 U.S. Dist. LEXIS 47985, at 10-11 (internal citations omitted). By filing Expert Declarations long after the Court-ordered deadline to produce expert reports, after experts had been deposed, after general and expert discovery had concluded, and, especially, after Plaintiff had already filed its Motion for Summary Judgment, Defendant improperly attempts "to

circumvent the expert discovery schedule established by this [C]ourt." *Id.* at 10 (internal citations omitted). As such, the Expert Declarations were untimely because they include "new examples and illustrations that could have been included in an original expert report." *Id.* at 11 (internal citations omitted). The Expert Declarations must thus be stricken and excluded pursuant to USCIT Rule 37(c) because they provide new methodologies, reasoning, and conclusions not expressed in the Initial Expert Reports, seek to strengthen opinions expressed in the Initial Expert Reports, and were submitted in flagrant disregard of this Court's scheduling orders. *Lilley*, 2019 U.S. Dist. LEXIS 47985, at 11.

Moreover, the untimely Expert Declarations are both dated August 26, 2024. *See* **Exs. A** and **B**. Plaintiff produced rebuttal expert reports to Mr. Reiner's and Mr. Benjamin's initial reports prepared by Mr. Stephen Velte to Defendant via email on March 4, 2024. *See* **ECF Nos. 31-19 and 31-20**. Subsequently, Mr. Reiner was deposed on April 5, 2024, Mr. Benjamin was deposed on April 11, 2024, and Mr. Velte was deposed on April 12, 2024. This concluded general and expert discovery in this case. This means that Expert Declarations were prepared after both Defendant's experts had already been deposed, after they had reviewed rebuttal reports to their Initial Expert Reports, and after they had an opportunity to review Plaintiff's arguments and reasoning in its Motion for Summary Judgment.

Finally, Defendant blindsided both Plaintiff and this Court when it requested an extension through and including August 30, 2024, from the original August 16, 2024, deadline to file Defendant's Cross-Motion. *See* Defendant's Consent Motion to Extend the Time Within Which to File Its Response to Plaintiff's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment (**ECF No. 32**). That consent motion (*see* **ECF No. 32**) indicated that the reason for the extension was Defendant's counsel's responsibilities in connection with other

matters. Plaintiff's counsel has also exchanged correspondence with Ms. Mikki Cottet where similar reasons were indicated. Based on that justification, Plaintiff consented to extend the deadline until August 30, 2024, for Defendant to file its Cross-Motion. Neither correspondence with Defendant's counsel nor the consent motion (*see* **ECF No. 32**) indicated that the time allotted to finalize Defendant's Cross-Motion was going to be used to complete Expert Declarations. Had Plaintiff's counsel been notified of this, Plaintiff would not have consented to the extension. As such, Defendant did not act in good faith when it misrepresented the reasons in obtaining Plaintiff's consent for the extension of time.

USCIT Rule 37(c)(1) mandates that a trial court sanction a party for discovery violations in connection with Rule 26 "unless the violation was harmless or substantially justified." USCIT Rule 37; *see, e.g., Hoffman v. Constr. Protective Servs*., 541 F.3d 1175, 1179 (9th Cir. 2008). Establishing that a failure to disclose was substantially justified or harmless "rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (citation omitted); *Zoltek Corp. v. United States*, 71 Fed. Cl. 160 (2006). "This is not a light burden as good faith is not a defense." *Bank One, N.A. v. Echo Acceptance Corp.*, No. 04-CV-318, 2008 U.S. Dist. LEXIS 36046 (S.D. Ohio Apr. 11, 2008).

When determining whether a violation of duty to supplement is justified or harmless, the following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered, (2) the ability of the party to cure the prejudice, (3) the extent to which introducing the evidence would disrupt the trial, and (4) the moving party's bad faith or willfulness in failing to comply with the disclosure rules. *See Guerrero v. Meadows*, 646 F. App'x 597 (10th Cir. 2016); *Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404 (3d Cir.

2006) (finding that the district court erred in permitting an expert's opinion that was more comprehensive than his pre-trial report).

Further, a party commits a willful violation when "he or she takes an action that he knew or … should have known, to be contrary to a court order." *Pyramid Real Estate Servs., LLC v. United States*, 95 Fed. Cl. 613, 623 (2010) [citations and quotations omitted]. As such, a district court "may punish for disobedience of an order only if the order is clear and unambiguous. *Fonar Corp. v. Deccaid Servs.*, Inc., 983 F.2d 427, 429 (2d Cir. 1993); *Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC*, No. 16-CV-1318 (GBD) (BCM), 2017 U.S. Dist. LEXIS 165702, at *57-58 (S.D.N.Y. July 18, 2017) ("Noncompliance with discovery orders is considered willful when the court's orders have been clear, when the party has understood them, and when the party's noncompliance is not due to factors beyond the party's control.").

In this case, this Court issued its Second Amended Scheduling Order (**ECF No. 23**) on May 12, 2023, stating that "[e]xpert reports shall be submitted on or before November 6, 2023" and that "[d]iscovery shall be completed on or before August 24, 2023." This Court's Second Amended Scheduling Order was both clear and unambiguous in providing the expert report and discovery deadlines. *See Id.* A scheduling order is not "a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Mills v. Steuben Foods, Inc.*, No. 19-CV-1178WMS(F), 2024 U.S. Dist. LEXIS 168566, at *16 (W.D.N.Y. Sep. 18, 2024) (internal quotation marks and citation omitted). As noted above, the additional opinions produced in the Expert Declarations go beyond supplementing Mr. Reiner's and Mr. Benjamin's Initial Expert Reports. *See* **ECF Nos. 37-2** and **37-3**. Instead, the Expert Declarations set forth new methodologies, reasoning, and conclusions, specifically indicted *supra*, and should have been included in the Initial Expert Reports. Because the expert report deadline had expired and

16

discovery had closed prior to any opportunity for Plaintiff to examine the new statements and the information upon which they are based, as well as depose Mr. Reiner and Mr. Benjamin on the new statements in the Expert Declarations, Defendant's attempt to introduce these new statements is in flagrant disregard of this Court's Second Amended Scheduling Order. Thus, Defendant's untimely submission of the new methodologies, reasoning, and conclusions included in the Expert Declarations is not only harmful and substantially prejudicial, but it also constitutes a willful violation of this Court's Second Amended Scheduling Order. *See Walter Int'l Prods. v. Salinas*, 650 F.3d 1402, 1413 (11th Cir. 2011) ("[I]t is harmful to deprive opposing counsel of the expert's report before his deposition."); *Poitra v. Sch. Dist. No. 1 in the County of Denver*, 311 F.R.D. 659, 670 (D. Colo. 2015) (having little time to "re-calibrate" trial preparation constitutes prejudice or harm).

As also explained in *Diaz v. Con-Way Truckload*, permissible supplementation means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure. 279 F.R.D. 412, 421 (S.D. Tex. 2012). Here, all information used in the Expert Declarations was available to Defendant's experts at the time of the Initial Expert Reports were disclosed and had they intended to include the additional findings they could have done so in the Initial Expert Reports. As such, Defendant's experts are not substantially justified in failing to provide their additional findings in the Initial Expert Reports. *See, e.g.*, *Dry Dock, L.L.C. v. Godfrey Conveyor Co.*, 717 F. Supp. 2d 825 (W.D. Wis. 2010) (excluding exhibits on motion for summary judgement because of failure to show how untimely production of documents was justified as required by Fed. R. Civ. P. 26(a) or (e)). Further, the late disclosure of the additional findings is not harmless because Defendant almost entirely relies on

the Expert Declarations to support Defendant's Statement of Facts and completely ignores the Initial Expert Reports.

Defendant's attempt to mask the new opinions and additional findings under the guise of the Expert Declarations has resulted in significant prejudice suffered by Plaintiff. Never-ending supplementations and additional expert disclosures "would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given." *Beller ex rel. Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003). "[T]here must be a practical end to expert discovery." *Panasonic Commc'ns Corp. of Am. v. United States*, 108 Fed. Cl. 412, 416 (Fed. Cl. 2013). Otherwise, allowing for experts to continually supplement their opinions with new statements or additional information "would signal to all litigants that the deadlines in this court's scheduling orders are mere suggestions. They are not." *Cahoon v. Orton*, No. 2:17-CV-63-D, 2020 U.S. Dist. LEXIS 32349, at *11 (E.D.N.C. Feb. 24, 2020).

Defendant's discovery abuse has substantially hindered Plaintiff's ability to effectively prepare its case as Plaintiff was deprived of any opportunity to validate the authenticity, credibility, or veracity of the new opinions and additional findings in the untimely Expert Declarations, as well as the underlying facts and evidence upon which they are based. As such, this Court must strike the Expert Declarations as untimely expert reports.

### B. Mr. Sullivan's Declaration and the Attachments Thereto Must Also Be Stricken as Untimely.

Mr. Sullivan's Declaration and attachments thereto (*see* **ECF No. 37-1**) must also be stricken and disregarded because they were produced after discovery had concluded and Plaintiff had already filed its Motion for Summary Judgment. Consequently, the underlying facts of Mr.

Sullivan's examination could not be probed. Additionally, even though Mr. Sullivan's examination was conducted remotely via video conference on Microsoft Teams, no video recording of the examination was provided.

As noted above, the untimely introduction of supplemental evidence introducing new facts must be barred if it is presented after discovery has closed. *See Ildico*, 2024 Ct. Int'l. Trade LEXIS 9. Also, various federal courts have consistently held that "[a] motion to strike is the appropriate means of objection to the use of affidavit evidence on a motion for summary judgment." *See Facey v. Dickhaut*, 91 F.Supp.3d 12, 19 (D. Mass. 2014); *Turner v. Hubbard Sys.*, 153 F. Supp. 3d 493 (D. Mass. 2015); *HMC ASSETS, LLC v. Conley*, No. 14-10321-MBB, 2016 U.S. Dist. LEXIS 111594 (D. Mass. Aug. 22, 2016); *Deighan v. SuperMedia LLC*, No. 14-264 S, 2016 U.S. Dist. LEXIS 163983 (D.R.I. Nov. 29, 2016); *Plante & Moran, PLLC v. Andover Healthcare, Inc.*, Civil Action No. 17-10093-DJC, 2018 U.S. Dist. LEXIS 192937 (D. Mass. Nov. 13, 2018); *Heal v. Wells Fargo, Nat'l Ass'n*, 560 F. Supp. 3d 347 (D. Mass. 2021); *Schuster v. Wynn Resorts Holdings, LLC*, Civil Action No. 19-cv-11679-ADB, 2023 U.S. Dist. LEXIS 31708 (D. Mass. Feb. 27, 2023).

In his Declaration prepared in support of Defendant's Cross-Motion, Mr. Sullivan describes his participation in the "opening and examination of the contents of eight boxes of what were said to be Swagtron® hoverboard models." **ECF No. 37-1** at ¶13. Mr. Sullivan was not "physically present in conference room 9217, located at 1100 L Street NW, Washington, DC, 20005, with the boxes of samples." *Id.* Instead, Mr. Sullivan participated via "[Microsoft] Teams" by observing the boxes as "a web camera was zoomed in to allow those of us participating via Teams to view the exterior of each box." *Id.* at ¶¶13-14.

19

Of particular importance, this "opening and examination" occurred on August 13, **2024**. *Id.* at ¶13 (emphasis added). Further, Mr. Sullivan's Declaration was executed on August 29, **2024**. *Id.* (emphasis added). However, pursuant to this Court's Second Amended Scheduling Order, discovery was to be completed "on or before August 24, **2023**." **ECF No. 23** (emphasis added). Accordingly, Defendant failed to produce a report or video recording of any "opening or examination" within the discovery period as Mr. Sullivan's virtual examination took place nearly one year after discovery had closed. *See* **ECF No. 37-1** at ¶13. As such, Plaintiff was never provided an opportunity to depose Mr. Sullivan and corroborate his findings or examine the methodology and process of the examination conducted via video recording.

Therefore, this Court must also strike Mr. Sullivan's Declaration and the attachments thereto due to their untimely disclosure and lack of video recording of the examination.

**C.  If this Court strikes Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, Defendant's Additional Rule 56.3 Statement (ECF No. 36-2) ("Defendant's Statement of Facts") Must Also be Stricken.**

If this Court strikes Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, this Court must also strike Defendant's Statement of Facts (**ECF No. 36-2**) because Defendant's Statement of Facts relies almost entirely on the Expert Declarations and Mr. Sullivan's Declaration. Without the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, Defendant's Statement of Facts is speculative, unsupported, and violates USCIT Rule 56.

In *Toledo-Colon v. Puerto Rico*, the court decided to strike plaintiff's statement of facts because it included facts that contained no record citation to demonstrate support, facts which cited exhibits but left out the specific location of the evidentiary support, and facts that were speculative. 941 F. Supp. 2d 234 (D.P.R. 2013). Further, in *Engers v. AT&T (In re Engers)*, the court granted defendants' motion to strike portions of plaintiffs' statement of facts to the extent that plaintiffs'

statement asserted legal and other arguments and relied on a declaration that was excluded. Civil Action No. 98-CV-3660 (JLL), 2005 U.S. Dist. LEXIS 41682 (D.N.J. Sep. 8, 2005). Finally, in *Kirklin v. Joshen Paper & Packaging of Ark. Co.*, the United States Court of Appeals for the Eighth Circuit upheld the district court's decision to strike most of the paragraph from plaintiff's statement of facts for (1) failing to cite to the record, (2) lacking the support of admissible evidence at trial, or (3) containing statements that were not properly supported by the material cited or that were otherwise irrelevant or immaterial. 911 F.3d 530 (8th Cir. 2018).

Similarly, in this case, should this Court strike Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, Defendant's Statement of Facts will essentially have no further support because Defendant's Statement of Facts relies almost entirely on the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto. Just like in *Toledo-Colon*, if this Court strikes the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, Defendant's Statement of Facts must also be stricken because it will include facts that contain no record citation to demonstrate support, facts which cite to stricken exhibits, and facts that are speculative. *Toledo*, at 239 (D.P.R. 2013). Just like in *Engers*, if this Court strikes the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, Defendant's Statement of Facts must be stricken because it will rely on declarations that are stricken or excluded. See *Engers*, 2005 U.S. Dist. LEXIS 41682, at 10-11. Finally, just like in *Kirklin*, if this Court strikes Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, Defendant's Statement of Facts must be stricken because it will essentially fail to cite to the record, lack the support of admissible evidence at trial, and contain statements that are not properly supported by the material cited. *Kirklin*, 911 F.3d at 533-534.

For the foregoing reasons, if this Court strikes the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, this Court must also strike Defendant's Statement of Facts (**ECF No. 36-2**).

### D. Amendments to the Compendium of Classification Opinions and the World Customs Organization Classification Opinions Must Also Be Stricken.

Defendant's untimely introduction of the Amendments (**ECF No. 37-8**) and the WCO Classification Opinions (**ECF No. 37-9**) with its Cross-Motion impermissibly attempts to introduce supplemental information not previously disclosed during discovery and should therefore be stricken. Specifically, Defendant cites to two WCO Opinions regarding classification of hoverboards for their "persuasive value." Defendant's Cross-Motion at 15; **ECF No. 37-9**. In further support of Defendant's analysis, Defendant additionally references the Amendments as produced by the WCO's Harmonized System Committee. **ECF No. 37-8**.

As determined previously by this Court in *Ildico*, the untimely introduction of supplemental evidence introducing new facts must be barred if it is presented after discovery has closed. *See Ildico*, 2024 Ct. Int'l. Trade LEXIS 9. In this case, the Amendments and WCO Classification Opinions were created in 2017 and 2018, respectively. *See* **ECF Nos. 37-8** and **37-9**. However, even though the introduction of new evidence was barred following the closure of discovery on August 25, 2023, as dictated by this Court's Second Amended Scheduling Order (**ECF No. 23**), Defendant first introduced these documents in Defendant's Cross-Motion, which was filed on September 4, 2024. *See* Defendant's Cross-Motion. Plaintiff detrimentally relied on Defendant adhering to the deadlines required by this Court under its scheduling orders and consequently submitted its Motion for Summary Judgement on July 12, 2024, based on the information disclosed by the Parties during discovery. *See* **ECF No. 31**. When Plaintiff filed its Motion for Summary Judgment (**ECF No. 31**) according to the Court-ordered deadline, neither the Amendments (**ECF**

No. 37-8) nor the WCO Classification Opinions (**ECF No. 37-9**) were available to Plaintiff. By therefore preventing Plaintiff from timely examining these documents, Defendant's willful violation and flagrant disregard of this Court's scheduling orders and its late production of the Amendments and the WCO Classification Opinions is unjustified and substantially harmed Plaintiff.

Accordingly, this Court must also strike the Amendments and the WCO Classification Opinions because they were produced after discovery had concluded and Plaintiff had already filed its Motion for Summary Judgment.

### E. This Court Must Impose Sanctions of Reasonable Expenses and Attorney's Fees Available Under USCIT Rules 37(c) upon Defendant.

Due to Defendant's willful violation of its disclosure obligations imposed by this Court's scheduling orders, this Court must exercise its discretion to not only strike the Expert Declarations; Mr. Sullivan's Declaration and the attachments thereto; Defendant's Statement of Facts; and the Amendments and the WCO Classification Opinions, but also award Plaintiff the reasonable expenses and attorney's fees associated with its efforts to resolve the issues presented in this motion.

Pursuant to USCIT Rule 37(c)(1), if a party relied on information not produced in compliance with the Court's scheduling order as required by USCIT Rule 26(e), that party may be sanctioned by excluding the prohibited information in briefing or at trial. *See, e.g.*, *United States v. Maverick Mktg.*, LLC, 439 F. Supp. 3d 1329, 1338 (Ct. Int'l Trade 2020); *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018) ("The disclosure mandates in Rule 26 are given teeth by the threat of sanctions in Rule 37.") (internal citation omitted). In addition to forbidding the use of this information, the Court may also award "reasonable expenses, including attorney's fees, caused by the failure." USCIT Rule 37(c)(1)(A); *see also* USCIT Rule 56(h)

(noting that if a declaration is submitted in bad faith, this Court may also instruct the offending party to pay the reasonable expenses, including attorney's fees, resulting from its submission).

The Federal Rules of Civil Procedure ("FRCP") 26 and 37 generally mirror the USCIT Rules 26 and 37, "and thus cases under FRCP are applicable in our court." *See United States v. Optrex Am., Inc.*, 28 Ct. Int'l Trade 993, 995 n.3 (2004); *United States v. Neman Bros. & Assocs.*, 18 Ct. Int'l Trade 89, 90 (1994); *XYZ Corp. v. United States*, 264 F. Supp. 3d 1348, 1352 n.2 (Ct. Int'l Trade 2017). As such, various federal courts have permitted an award of monetary sanctions under Rules 26 and 37 in the form of reasonable expenses and attorney's fees associated with violations of disclosure obligations. *Lockhart v. Techtronic Indus. N. Am., Inc.*, No. 23-15872, 2024 U.S. App. LEXIS 7934 (9th Cir. Apr. 3, 2024) (affirming the district court's holding that reasonable expenses, including attorney's fees, were due to the movant as a result of a failure to timely serve Rule 26 disclosures); *McDowell v. Livonia Hotel Bus., Inc.*, No. 22-1740/1764, 2023 U.S. App. LEXIS 17819, at *26 (6th Cir. July 11, 2023) (affirming the district court's grant of reasonable expenses, including attorney's fees, as a result of untimely expert disclosures); *Solis-Marrufo v. Bd. of Comm'rs for Bernalillo*, No. CIV 11-0107 JB/KBM, 2013 U.S. Dist. LEXIS 55068 (D.N.M. Apr. 4, 2013) (granting non-offending party certain fees and costs incurred from late disclosures).

Specifically, as confirmed by the U.S. Court of Appeals for the Federal Circuit, Rule 37 sanctions are appropriate when there is a willful violation of a clear and unambiguous order. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1355 (Fed. Cir. 2022). Here, Defendant's untimely disclosures were in willful, flagrant disregard of this Court's Second Amended Scheduling Order, which clearly and unambiguously stated the deadline for discovery in this matter. *See* **ECF No. 23**. Additionally, Defendant blindsided both Plaintiff and this Court

by not disclosing its plans to work on the Expert Declarations when it requested an extension through and including August 30, 2024, from the original August 16, 2024, deadline to file Defendant's Cross-Motion.

As a consequence of Defendant's disclosure violations, Plaintiff was forced to expend considerable time and resources to analyze Defendant's new evidence, review the new findings of Defendant's experts, and prepare this motion. As such, this Court must award Plaintiff the reasonable costs, including attorney's fees, available under Rule 37 in light of Defendant's untimely disclosures, and any other sanctions that this Court deems appropriate.

### III. CONCLUSION

The untimely Expert Declarations (*see* **ECF Nos. 37-2** and **37-3**) set forth new methodologies, reasoning, and conclusions, and are essentially disguised additional expert reports produced after Court-ordered deadline, after experts had been deposed, after general and expert discovery had concluded, and after Plaintiff had filed its Motion for Summary Judgment. As such, Expert Declarations must be stricken.

Mr. Sullivan's Declaration and the attachments thereto (*see* **ECF No. 37-1**) should also be stricken and disregarded because they were produced after discovery had concluded and Plaintiff had already filed its Motion for Summary Judgment.

If this Court strikes the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, this Court must also strike Defendant's Statement of Facts (**ECF No. 36-2**) because Defendant's Statement of Facts relies almost entirely on the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto. Without the Expert Declarations and Mr. Sullivan's Declaration and the attachments thereto, Defendant's Statement of Facts is speculative, unsupported, and violates USCIT Rule 56.

This Court must also strike the Amendments (**ECF No. 37-8**) and the WCO Classification Opinions (**ECF No. 37-9** and **ECF No. 36, pp. 106-112**) because they were produced after discovery had concluded and Plaintiff had already filed its Motion for Summary Judgment.

Finally, pursuant to USCIT Rule 37(c)(1)(A) and due to Defendant's willful violation and flagrant disregard of a clear and unambiguous scheduling order and untimely disclosures, this Court must award Plaintiff the reasonable costs, including attorney's fees, and any other sanctions that this Court deems appropriate.

WHEREFORE, Plaintiff respectfully requests that judgment be granted in its favor; that this Court strike Defendant's Declaration of Norbert (Bert) Reiner (**ECF No. 37-2**), Declaration of Edward Benjamin (**ECF No. 37-3**), Defendant's Additional Rule 56.3 Statement (**ECF No. 36-2**), Declaration of Mr. Matthew Sullivan and the attachments thereto (**ECF No. 37-1**), as well as the Amendments to the Compendium of Classification Opinions (**ECF No. 37-8**) and the World Customs Organization Classification Opinions (**ECF No. 37-9**); award Plaintiff the reasonable costs, including attorney's fees, associated with its work resulting from Defendant's willful disclosure violation; and grant such other additional relief as this Court deems just and appropriate.

Respectfully submitted,

Dated:    September 27, 2024

Serhiy Kiyasov, Attorney

Lawrence R. Pilon
Austin J. Eighan
Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Plaintiff 3BTech, Inc.*

26

# Exhibit A

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                              :
3B TECH, Inc.,                                :
                                              :
               Plaintiff,                     :
                                              :
         v.                                   :        Court No: 21-cv-00026
                                              :
UNITED STATES,                                :
                                              :
               Defendant.                     :
_____     :

## EXPERT WITNESS REPORT OF BERT L. REINER

At the request of Mikki Cottet, Esq., counsel for defendant, the United States, in the

above action, and in compliance with the Court of International Trade Rule 26(a)(2)(B), I

submit this written report.

## OPINION

I understand that this case involves the classification of imported merchandise

under the Harmonized Tariff Schedule of the United States.  From reading the complaint, I

understand that the imported merchandise includes several different models of goods

"collectively known, commercially and in the industry, as 'self-balancing electric scooters'

and popularly referred to as hoverboards."  I understand that the plaintiff in this case,

3BTech, Inc., states that these hoverboards are "electric scooters" and should be classified as

"wheeled toys."  Ms. Cottet has advised me that there is a question as to whether

hoverboards fall within the same class or kind of merchandise principally used as "toys" and

more specifically "wheeled toys" like "tricycles, scooters, pedal cars and similar wheeled

toys."

Based upon my education, training, and professional experience, it is my opinion that the hoverboards that are the subject of this case are not "wheeled toys" and are not within the same class, or kind as with "tricycles, scooters, pedal cars and similar wheeled toys."

## BASIS AND REASONS FOR MY OPINION

I base my opinion on my education, training, and professional experience.  My curriculum vitae is attached to this report.

I have been in the toy industry since 1967 and for more than 30 years, I have also been in the infant products, juvenile furniture, and sporting goods industries.  I am an active member of the ASTM committee on safety F15.  I worked for two of the most successful toy companies in the United States, Coleco Industries, Inc., and Ideal Toy Corp.  I was responsible for developing, engineering, quality assurance and manufacturing of toys, infant products, and sporting goods.  While at Coleco I created the Cabbage Patch Kids and pedal cars.  These pedal cars, commonly known as the "Big Wheel," were licensed by Rambo, Transformers, Sesame Street, etc. and were marketed and sold by Coleco.  I also designed and manufactured wheeled toys which were a line of Disney tricycles for Mattel.  These were all advertised and sold by Coleco and/or Mattel, and were sold in stores like Toys-R-Us and Walmart, etc.  Therefore, I have an extensive background and knowledge of toys, and am familiar with the category of toys known as "wheeled toys."

Based on my experience in the toy industry, wheeled toys are defined as "ride-on" toys, which allow children to enjoy the sense of movement and to pretend as they imitate adults. "Ride-on" toys generally have wide-spaced wheels (or more wheels in the case of tricycles) that make balancing easier, with pedals, hand-levers, and seats. They can be used

by applying pressure of the foot against the pedals, or the ground, or drawn or pushed by another person, or be driven by a simple motor.  In the toy industry, and as observed by the court in *StreetSurfing LLC v. United States*, 11 F. Supp. 3d 1287 (CIT 2014), wheeled toys do not require training prior to use, they are principally for amusement.  They are also characterized by the following features: (1) absence of a training requirement prior to its use, (2) absence of a meaningful risk of injury in its use, and (3) lack of required skill to fully utilize the item.  Wheeled toys can be used safely by a child with minimal supervision, and with minimum prior instruction.

Because hoverboards are relatively new, in that they were invented in 2012, to further inform my opinion, I reviewed and considered (1) documents; (2) how hoverboards are defined; (3) how they are sold by hoverboard manufacturers; (4) how they are advertised, marketed, and sold in retail stores; (5) applicable regulations and public ordinances; and (6) manufacturer's safety guidelines, cautions/warnings and other safety standards.

The documents and data I considered in forming my opinion are:

(1)  Complaint, Court #21-ev-00026, dated December 10, 2021.

(2)  Plaintiff's Rule 26 Disclosures dated April 11, 2022.

(3)  Swagtron® Catalog.

(4)  Swagtron® User Manual.

(5)  Swagtron® Design diagrams.

(6)  UL 2272 Safety Standard for e-Mobility devices, dated November 21, 2016.

(7)  ASTM F2641-15 Standard for Power Scooters and Bikes, approved June 1, 2015.

(8)  ASTM F2642-15 Standard for Scooters and Bike Instructions, approved June 1, 2015.

(9)  ASTM F963-17 Standard Specification for Toy Safety, approved May 1, 2017.

(10)  ASTM F1492-08 Standard Specification Skateboard Helmets, approved July 1, 2008.

(11)  ASTM F2043-18 Standard Bicycle classification, approved July 1, 2108.

(12)  ANSI Z535.4 Standard for product signs.

(13)  Consumer Product Safety Commission (CPSC) 16 C.F.R. part 1512 Regulations for Bicycles.

(14)  CPSC "Age Determination Guidelines", dated January 2020.

(15)  U.S. Harmonized Tariff Schedule, Chapter 95 (2018).

(16)  U.S. Harmonized Tariff Schedule, Chapter 87 (2018).

(17)  U.S. Patent #8,738,278 B2, issued May 27, 2014.

(18)  U.S. Design Patent #D778,782-S, issued February 14, 2017.

(19)  SGS Certificate of Compliance #SGSNA/22/SZ/00097, dated April 22, 2022.

(20)  Wikipedia "Hoverboard (or Hover Board)", dated March 4, 2023.

(21)  Oxford Dictionary, new international unabridged, dated 2022.

(22)  California Bill #604, "Electric motorized boards".

(23)  Federal Hazardous Substance Act (FHSA) 16CFR part 115.

(24)  U.S. News and World Report, "Hoverboard Accidents", dated March 26, 2018.

(25)  *StreetSurfing LLC v. United States*, 11 F. Supp. 3d 1287 (CIT 2014).

(26)  CPSC "The Duty to Warn handbook", dated 1996.

I understand that a hoverboard is a two-wheeled, self-balancing, transportation device for one person. They have foot placement sections on a flat board with sensors, and they are equipped with a gyroscope and two motors.  They appear to require balance and core abdominal strength.  They do not have any assistive devices (like a seat, additional wheels, handlebars, steering wheel, pedals, or brakes); rather, steering and stopping are controlled by the dynamic equilibrium based on the shifting of one's bodyweight.  There also appears to be significant risks of injury associated with the use of hoverboards, like falling forward or backward, which can cause elbow, ankle or wrist fractures, or even traumatic brain injury.  On the other hand, the risk of injury associated with the use of "wheeled toys" are significantly lower.

I considered how major hoverboard manufacturers, Swagtron, Razor (Hovertrax), Segway (Ninebot), DGL (Hover-1), Jetson (Jetson), Shenzen Uni-Chic (Evercross), Zhejiang Qunying (TPS), Shenzen Uni-Sun (Veveline), Zhejiang Taotao (Gotrax), market their hoverboards.  My research revealed that **none** of these manufactures market their hoverboards as toys, or (non-electric) bicycles, or (non-electric) scooters.  Likewise, in reviewing products of major toy manufacturers such as Mattel, Hasbro, Jakks-Pacific, Leap Frog, Little Tikes, I found that <u>none</u> of these companies manufacture or market hoverboards.

I visited several retail establishments to inform myself of how hoverboards were marketed and in which sections of these stores they were sold.  I visited Big 5 (sporting goods), Best Buy (electronics), Dick's (sporting goods), Lowe's (home center), Bass Pro-Shop (sporting goods), Rogue (toys), Toy Shack (toys), Trek (bicycles), Costco (warehouse), Walmart (super center), Target (supercenter), and Macy's (department store). I observed that in retail stores, hoverboards were <u>always</u> found in the Sporting Goods stores or departments, where other motorized products were sold, as was the case in Big 5 (carries Hover-1), Best Buy (carries

Swagtron, Hover-1), Dick's (carries Swagtron, Jetson, NHT), Lowe's (carries Swagtron, Jetson), and Bass Pro-Shop (carries Swagtron). I also observed that toy stores and toy departments did not contain hoverboards, as was the case at Rogue Toys, Toy Shack, Trek Cycles, Costco.

I also visited retailers that sell both sporting goods and toys. I found that at Walmart, hoverboards were displayed and sold only in their sporting-goods department which sold hoverboards by Swagtron, Hover-1, Razor, and Jetson. They also sold electric scooters in the sporting-goods department. Similarly, in Target hoverboards were displayed and sold only in their sporting goods dept which carried hoverboards by Hover-1, Jetson, Razor, Rydon. They also displayed and sold electric scooters in the sporting goods department. Macy's displays and sells hoverboards only in the sporting goods department, which were the Hovertrax, Hover-1, and Moto Tec. Electric scooters are only sold in their sporting goods department.

Because the hoverboards that were imported by 3BTech were described as a "personal transporter" and as a "vehicle" by the manufacturer, I reviewed and considered several ordinances regarding the use of hoverboards. The public use of hoverboards is regulated differently by states, cities, and municipalities. For example:

> Alabama: OK on public roads (on roads <25mph), and sidewalks.
>
> Alaska: OK on public roads, under 15mph [28.90.990].
>
> Arizona: Banned [ARS-813].
>
> California: Requires that persons be 16+, wear safety gear, on roads <35mph, [Bill #21292].
>
> Illinois: Not regulated.
>
> Nevada: Not regulated.
>
> Las Vegas: Banned on the Strip.
>
> New Jersey: Banned on public roadways [Title 39].
>
> New York: Banned on public streets and sidewalks.

New York City: Prohibits use on trains, buses, railroads, subway platforms, [VAT #114-d].

Pennsylvania: OK on roadways <35mph, sidewalks, [Sect 102].

Philadelphia: Requires that persons be 12+, wear helmet, knee/elbow pads.

Virginia: ok on roadways <25mph, prohibited on highways. [46.2-906.1].

In 2015, U.S. News reported that 26,854 patients were admitted to U.S. hospitals due to falls and collisions involving hoverboards. Users of hoverboards, in-line skates, electric scooters, etc. frequently suffer injuries. Riders may easily be thrown from small cracks and outcroppings in pavement, especially where the cracks run across the direction of travel. I reviewed the safety standards that apply to hoverboards. Hoverboard manufacturers generally provide instructions where they strongly recommend that users wear helmets, elbow, wrist, and knee pads. So, I reviewed Swagtron® safety instructions, cautions and warnings stated in the Swagtron® User Manual. The Swagtron® instructions for their hoverboards state: "WARNING: Never ride at high speeds, on uneven terrain, perform stunts, turn abruptly, ride in the rain. Failure to use common sense and heed the above warnings increases the risk of serious injury, or in very rare cases, death." They also state: "Learning Mode is ideal for new or inexperienced riders." They also state: "Inherent hazards…losing control, falling off, riding into a hazardous situation. . . muscle injuries, broken bones, lacerations, or other serious injuries that may be sustained while using SWAGTRON®". Finally, they state: "If the SWAGTRON® does not enter self-balancing mode when triggering the foot-switch, the warning LED will light up…Do not tilt forward or backwards beyond 10º…avoid uneven or rocky surfaces…avoid hills or slope of more than 30º…avoid turning suddenly…avoid riding sideways or turning on slopes."

I also reviewed safety standards that apply to hoverboards and toys.

**ASTM F2641-15**: This standard covers power scooters and power bikes, and it is also the safety standard used by hoverboard manufacturers.  It covers the safety aspects of their brakes, electrical systems, curb impact tests, dynamic strength tests, etc.

**ASTM F978-17**: This standard covers safety requirements for toys, but it does <u>not</u> include hoverboards, or electrically powered scooters or bikes (separately covered by F2641), or bicycles (separately covered by F2043).

**UL 2272**: In response to high risks associated with fires from the rechargeable lithium-ion battery systems used in hoverboards, (named e-Mobility Devices), Underwriters Laboratories (UL) issued the UL 2272 Standard.  To meet compliance, UL conducts tests for over-charging, short-circuit, temperature, imbalance, dielectric Voltage, isolation resist, shock, drop, etc.  It is federally mandated that all hoverboards be UL listed and certified.

## COMPENSATION

I am being compensated at an hourly rate of $375/hour for the study of the issues in connection with this issue, and $475/hour for depositions and trial.

## PREVIOUS TESTIMONY

I have testified as an expert at trial and/or depositions in numerous cases; however, I have not testified in a trial or deposition in the last four years.  I submitted an expert report in connection with *StreetSurfing LLC v. United States*, 11 F. Supp. 3d 1287 (CIT 2014), involving the classification of Waveboards.

Respectfully submitted,

Bert L. Reiner
October 27, 2023

# Bert L. Reiner

*Curriculum Vitae*:                        **Tel: (702) 838-8997**
                          **Email: bert@reinerinc.com   Cell: (702) 985-4075**
                          **Web: *www.REINERINC.COM***


**Expertise:**      Experience in mechanical and electro-mechanical Engineering, Quality Assurance, Ergonomics, and Manufacturing of Toys, Sporting Goods, Swimming Pools, Juvenile Furniture, Playgrounds and Sporting Goods equipment.  Conversant with UL, ASTM, ANSI, CPSC standards.


**Experience**:      **REINER Associates, Inc.** *President:*
6/88 to present    Consultants to the Toy, Juvenile, Recreation and Consumer products industries. Managing *turnkey* projects from concept into production; Engineering, Tooling, Manufacturing & Quality Assurance.

3/85 to 5/88:      **COLECO Industries, Inc.** *Senior Vice President Quality Assurance:*
                 Directed world-wide Quality programs for outdoor-products, sporting-goods, juvenile furniture, electro-mechanical toys, and Cabbage-Patch dolls.

4/69 to 2/85:      **COLECO Industries, Inc**. *Vice President Engineering:*
                 Managed the Engineering, Design, Pattern, Tooling, Software programming, PCB design, Mold procurement, Technical illustrations, & Model-making departments.

1/67 to 3/69:      **IDEAL Toy Corp.** *Director Far East Manufacturing:*
                 Responsible for manufacturing and quality of toys & dolls imported from the Orient. Found new sub-contractors, negotiated advantageous purchase agreements, sought new product ideas.


**Education**:      **Rensselaer Polytechnic Institute,** *Bachelor Mechanical Engineering*, BME
                 **AMA-** Executive Effectiveness;  Management Training.
                 **SPE**-Ergonomics; Plastics technology.
                 **Education & Training**- History includes on-the-job experience and management.


**Professional**: **SPE**- Society of Plastics Engineers *(senior member)*
                 **ASME**- American Society Mechanical Engineers *(senior member)*
                 **ASTM**- American Society for Testing and Materials *(member of several F15 committees)*
                 **TIA**- Toy Industry Association *(associate member)*

# Exhibit B

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____
                           :

3B TECH, Inc.,                  :

            Plaintiff,        :

                           :

        v.               :      Court No: 21-cv-00026

                           :

UNITED STATES,         :

           Defendant.    :
_____ :

### EXPERT WITNESS REPORT OF EDWARD BENJAMIN

    At the request of Mikki Cottet, Esq., counsel for defendant, the United States, in the

above action, and in compliance with the Court of International Trade Rule 26(a)(2)(B), I submit

this written report.

    I understand that this case involves the classification of imported merchandise under the

Harmonized Tariff Schedule of the United States. I understand that the imported merchandise

includes several different models of goods "collectively known, commercially and in the

industry, as 'self-balancing electric scooters' and popularly referred to as hoverboards." I also

understand that the plaintiff in this case, 3BTech, Inc., alternatively states that these hoverboards

are "electric scooters" and should be classified as "wheeled toys." I also understand that they are

alternatively stating that these are skateboards.

### OPINION

    Based upon my training and professional experience, it is my opinion that the

hoverboards are electric micro mobility vehicles. Hoverboards have side by side wheels,

gyroscopes, micro processors, electric motors, controllers, and batteries, and they are controlled by the body position and movements of the rider. Hoverboards are fundamentally the same as other side by side vehicles that are controlled by the rider's body position and movements. The Segway and Toyota Winglet are similar in operation and function to hoverboards, and they are intended and used as vehicles.

BASIS AND REASONS FOR MY OPINION

I am currently the Senior Managing Director of eCycleElectric Consultants and the Chairman of the Light Electric Vehicle Association (LEVA), and I base my opinion on my training, and professional experience. My curriculum vitae is attached to this report.

I am a consultant in the micro-mobility business, which includes the electric vehicle industry, the bicycle industry, and the components for such, which are all inter-related. Since 1996, I have provided marketing information, systems integration consulting, product design, component selection, risk management advice, introductions, supplier/customer connections and supplier validation. It is my business to know the use and distribution of micro mobility vehicles of all kinds, and I also compile reports based on customs information on market size in the United States.

For many years, I have traveled more than 200 days per year to visit factories, retailers, distributors, and consumers in the electric micro-mobility business. I have extensive experience in product development and sourcing from Asia and Europe - working with electric vehicle manufacturers (OEMs), motor, battery and motor controller companies, and importers and distributors of small electric vehicles. I also participate as a speaker at international LEV related conferences in the Europe, United States, and Asia.

I am a co-Founder and the Chairman of the Light Electric Vehicle Association (LEVA). LEVA represents the strategic interests of light electric vehicle retailers, dealers, distributors, manufacturers, and suppliers to promote the development, sale, and use of LEVs worldwide. LEVA provides members with networking opportunities and educational resources to expand their businesses, which includes technician training.

Micro-mobility refers to smaller vehicles with electric drivetrains, such as electric scooters, hoverboards, and Segways. They are also referred to by the term "Light Electric Vehicles," and in the case of side by side wheels: "transporters." These vehicles are battery-powered and emit zero emissions. A special feature of many of these vehicles is that they are portable, allowing the users to take the vehicles onto public transport.

I reviewed the user manual for the Swagtron Hands Free Smart Board (T1 User Manual), and found that on page 6, the manual describes to the hoverboard as a vehicle, stating: "This User manual will guide you through the functions and usage of your SWAGTRON®. Before operating this vehicle, read all the instructions for safe assembly, charging and operation." The user manual provides the following description: "The SWAGTRON® is a self-balancing, personal transporter that uses gyroscopic technology to revolutionize the way you travel. Steering and stopping are controlled by Dynamic Equilibrium all based on the shifting of your body weight." These descriptions, coupled with claimed top speeds of the hoverboards at issue as being 8 mph, confirms that these hoverboards are vehicles, not toys.

I reviewed the operating paradigm (where the vehicle is controlled by the position and movement of the rider's body) of Segway and hoverboards at https://www.segway.com/ninebot-

s/ and https://hoverboard.com/collections/hoverboards to confirm my memory and ideas. I also reviewed US Patent US-10118661-B2 (the patent for Segway).

The Swagtron hoverboards are not skateboards. Skateboards have 4 wheels, are powered by the rider pushing off with their foot and are not normally equipped with an electric motor. The wheels are mounted on trucks (axels bolted on front and rear to the deck), and there are no gyroscopes or microprocessors involved. Steering is controlled by rider position, but this is by way of causing the mechanical forward truck to steer in the direction of the rider's weight.

COMPENSATION

I am being compensated at an hourly rate of $400/hour.

PREVIOUS TESTIMONY

Although I have testified as an expert at trial and/or depositions in several cases; I have not testified in a trial or deposition in the last four years.

Respectfully submitted,

Edward Benjamin
Fort Myers, FL
Monday, November 6, 2023

Edward Benjamin
2307 Kent Ave.
Fort Myers, FL 33907
1-239-410-5187
ed@eCycleElectric.com

Edward Benjamin is a highly experienced consultant in the micro-mobility, electric vehicle and bicycle industry. He has provided marketing information, systems integration consulting, product design, component selection, risk management advice, introductions, and supplier / customer connections as well as supplier validation since 1996.

Benjamin is attentive to the use and distribution of micro mobility vehicles of all sorts, and compiles reports based on customs information on market size in the USA.

Currently Senior Managing Director of eCycleElectric Consultants, (1996 -present) and Chairman of the Light Electric Vehicle Association (2008 -present)

Currently the lead instructor for LEVA Technician Training program, (2010 - present)

eCycleElectric has contracted Benjamin's services to a wide range of brands, factories, and component makers as well as technology developers over the years. Some notable examples:

Weel - on going
QuietKat - on going
Metalsa - 2021-2022
General Motors, several engagements, from 2004 to 2019.
Harley Davidson project 2018-19
Suzhou Bafang Motor Company, several engagements from 2004 - 2018
Bangkok Cycle (2004-2008)
Tokyo R&D (2009)
Honda R&D (several engagements 1998 - 2021)
Fairly Bike Manufacturing (several engagements 2004-2015)
Dayron (1996-98)
ASI (2001-2014)
BionX (2003-4)
Taiwan DC Motor (later Ultra Motor) (several engagements spanning 1999-2008)
Hero Bicycles (2005)

There were many other clients, involving much of the western bicycle brands and Asian factories involved in the bicycle, battery, motor, and controller business.

Benjamin has worked as an expert witness for both plaintiff and defendant, on bicycle, batteries, motors, and electric bicycle issues, 7 times.

Education: BA Education from University of Kentucky, 1982.
Various professional and technical training events.

Languages: fluent English, poor Mandarin.

Married, 5 adult children.

Hobbies and interests: SCUBA diving, Karate.

# Exhibit C

**PLAINTIFF'S EXHIBIT**
#15-AL-4/11/24

| From: | Cottet, Mikki (CIV) |
|---|---|
| To: | Ed Benjamin |
| Subject: | RE: [EXTERNAL] Draft B |
| Date: | Monday, November 06, 2023 4:35:00 PM |
| Attachments: | image001.png |

I reviewed the user manual for the Swagtron Hands Free Smart Board (T1 User Manual), and found that on page 6, the manual refers to the hoverboard as a vehicle, stating "This User manual will guide you through the functions and usage of your SWAGTRON®. Before operating this vehicle, read all the instructions for safe assembly, charging and operation." The user manual provides the following description: "The SWAGTRON® is a self-balancing, personal transporter that uses gyroscopic technology to revolutionize the way you travel. Steering and stopping are controlled by Dynamic Equilibrium all based on the shifting of your body weight." This description, coupled with claimed top speeds of the hoverboards at issue as being 8 mph and above, confirms that these hoverboards are vehicles, not toys.

Mikki Cottet
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
National Courts Section
PO Box 480, Ben Franklin Station
Washington, DC 20044
Office Tel. No. (202) 307-0962
Mobile No. (202) 598-0030
Fax No. (202) 353-0461
Email: Mikki.Cottet@usdoj.gov
(*For overnight or hand deliveries, please use 1100 L Street NW, Rm 9522, Washington, DC 20005*)



**Confidentiality Statement:**
*This message is transmitted to you by the National Courts Section of the U.S. Department of Justice. The message, including any attachments to it, may be confidential and legally*

*privileged.  If you are not the intended recipient of this message, please destroy it promptly without further retention or dissemination (unless otherwise required by law). Please notify the sender of the error by a separate e-mail or by calling (202) 307-0962.*

**From:** Ed Benjamin <ed@ecycleelectric.com>
**Sent:** Monday, November 06, 2023 3:39 PM
**To:** Cottet, Mikki (CIV) <Mikki.Cottet@usdoj.gov>
**Subject:** [EXTERNAL] Draft B

## <u>CERTIFICATE OF SERVICE</u>

I, Serhiy Kiyasov, one of the attorneys for the plaintiff, certify that copies of Plaintiff

3BTech, Inc.'s Motion To Strike Defendant's Expert Declarations, Mr. Sullivan's Declaration

and Attachments Thereto, Defendant's Additional Rule 56.3 Statement, Amendments To The

Compendium Of Classification Opinions, And The World Customs Organization Classification

Opinions And Motion For Attorney's Fees And Expenses were served on all parties by filing a

copy via the U.S. Court of International Trade's CM/ECF System this Friday, September 27,

2024.

Respectfully submitted,

Dated:    September 27, 2024

Serhiy Kiyasov, Attorney

Rock Trade Law LLC
134 North LaSalle Street, Suite 1800
Chicago, Illinois 60602
312-824-6195 (telephone)
skiyasov@rocktradelaw.com (e-mail)

*Counsel For Plaintiff 3BTech, Inc.*